RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 20-1633

MICHAEL AKEEM WHITE, JR.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00044-1—Robert J. Jonker, District Judge.

Argued: March 2, 2021

Decided and Filed: March 8, 2021

Before: GILMAN, GIBBONS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Jasna Tosic, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Jennifer L. McManus, Austin J. Hakes, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Jasna Tosic, Joanna C. Kloet, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. When an undercover officer sought to purchase cocaine from a suspected drug dealer, he watched as the dealer went into Michael White's house before

emerging with drugs to complete the sale. A similar sequence repeated itself roughly forty days later. Based on this information, a state judge approved a search warrant for White's house, where officers found guns, drugs, and cash. The district court granted White's motion to suppress the evidence, believing that probable cause did not exist without more evidence that contraband would be found inside the residence. We disagree and reverse.

I.

Muskegon County Detective T. Schmidt investigated illegal drug trafficking in western Michigan as an undercover agent. While in a car with a suspected drug dealer named Jared Conkle in early December 2019, Schmidt asked to buy some cocaine. Conkle knew where to go. He told Schmidt to "park in the rear" of a house that belonged to Michael White, whom he described as an "acquaintance." R.15-1 at 2. Schmidt watched Conkle exit the car, walk into White's house, and reemerge, after which Conkle handed Schmidt three grams of cocaine.

A similar sequence repeated itself about forty days later. Schmidt approached Conkle and again asked him where he could buy cocaine. Conkle again took him to White's house. Rather than direct Schmidt to the rear of White's house, Conkle told Schmidt to follow him to a nearby alley. Schmidt handed Conkle some pre-marked cash, and Conkle drove by himself to White's house. Another detective watched as Conkle approached the house, exited his car, and entered through the back. Conkle reemerged, got back into his car, and traveled back to Schmidt, where he completed the sale.

Believing that White kept drugs inside his house for distribution, Schmidt applied for a search warrant within 48 hours of Conkle's second purchase. He gave the above account, then explained that, "based on [his] training and experience" of seventeen years, drug dealers often keep "controlled substances at residences of other individuals" they know. *Id.* at 3. Schmidt explained how he confirmed that the home belonged to White. Because he feared that knocking and announcing the officers' presence might "endanger [their] safety" and because he thought that White might "attempt to dispose" of drugs if they knocked, Schmidt also sought permission for a no-knock warrant. *Id.*

A Michigan state judge approved the requests. The search turned up over 20 grams of cocaine, over 30 grams of "crack" cocaine, a stolen semi-automatic handgun, an AR-style rifle, and over $2,500 in cash. The government charged White with being a felon in possession of a firearm, possessing a firearm to further drug trafficking, possessing with intent to distribute controlled substances, and brandishing a weapon to further drug trafficking. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2), 924(c)(1)(A); 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

Before trial, White moved to suppress the evidence recovered during the search, arguing that Detective Schmidt's affidavit failed to establish probable cause. The district court granted the motion.

The government appeals.

## II.

*Probable cause*. The Fourth Amendment protects the "right of the people to be secure in their . . . houses" and requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In deciding whether "probable cause" exists to issue a warrant, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In reviewing challenges to a warrant, we ask whether the magistrate had a "substantial basis" for finding probable cause. *Id.*

This warrant passes the test. The sequence of events, all explained in the affidavit Detective Schmidt provided with the warrant application, goes a long way to showing why. Recall each step. Detective Schmidt asked Conkle, a suspected drug dealer, for cocaine. Conkle directed Detective Schmidt to White's house. Conkle went into White's house and reemerged to meet up with Schmidt. Only then did Conkle produce the drugs to complete the sale. Conkle's visit to White's house between the offer and the sale raised a "common-sense" inference and a "fair probability" that he obtained drugs from White's house. *See id.*

Even if doubt might cloud that conclusion after one transaction—perhaps Conkle had the drugs all along or perhaps Conkle had sold the last of the cocaine from White's house—that is not all there is. A second buy occurred forty days later and reinforced the inference. Detective Schmidt again approached Conkle to buy cocaine from him. Conkle again went into White's house. After leaving White's house, Conkle again produced cocaine for sale to Schmidt. At a minimum, the second buy gave Schmidt ample reason to seek a warrant and the magistrate ample reason to grant one.

This conclusion does not blaze a new trail. *United States v. Ellison* involved a similar situation, in which an informant observed two people complete a drug transaction outside of the target house. 632 F.3d 347, 348 (6th Cir. 2011). According to the affidavit, the informant saw a person exit the home, provide a buyer with a "large quantity of cocaine in a plastic bag," and return inside. *Id.* (quotations omitted). That sufficed to meet the probable cause requirement, we reasoned, because the "[c]ommission of a drug transaction outside of a house and one participant's walking back into the house . . . plainly demonstrated a sufficient nexus with the house." *Id.* at 349. The informant not only watched the deal from outside the home, but he also saw that someone "came out of" and "returned to" the residence during the transaction. *Id.* at 350. White's house likewise amounted to the pivot on which each cocaine deal turned. Officers watched as Conkle twice went into and returned from White's house before producing cocaine to complete the deal. That he went to the home only after Detective Schmidt asked for cocaine supports an inference that drugs were stored inside the house. Whether in *Ellison* or here, these fair-minded inferences and implications "demonstrate[] a sufficient nexus with the house." *Id.* at 349.

Other cases, including some with just one controlled buy, have likewise met the probable cause bar. *United States v. Pinson* looked at whether a single controlled purchase by an informant within 72 hours of the search warrant application established probable cause. 321 F.3d 558, 560–61 (6th Cir. 2003). The affidavit explained that the officer gave an informant buy money and "observed" the informant "enter through the front door of [the] stated address and momentarily return[] through the same door." *Id.* at 560. At that point, the informant "walked directly back" to the officer, "turning over a large yellowish rock that later field tested

positive for cocaine base." *Id.* at 560–61. This pattern, we said, "[o]bviously" linked the house to evidence of drug sales. *Id.* at 564.

Other circuits have reached similar conclusions in the context of controlled purchases designed to ferret out whether a home is being used for drug trafficking. The Tenth Circuit found that probable cause existed to search a residence after police twice observed an informant enter and exit a residence during a drug transaction. *United States v. Artez*, 389 F.3d 1106, 1110 (10th Cir. 2004). Even though officers used an additional middleman "as an intermediary between the confidential informant and the suspect residence," the affidavit passed the probable cause test. *Id.* at 1112. The First Circuit found that probable cause supported the search of an apartment after a confidential informant told officers of drug sales inside and police observed only that the informant entered the apartment building, not the particular apartment targeted. *United States v. Khounsavanh*, 113 F.3d 279, 281–82 (1st Cir. 1997). The detective watched as the informant "went to the apartment . . . after having been patted down, and emerged several minutes later with crack, explaining that he had purchased crack" from one of the suspects. *Id.* at 286. Even while acknowledging that the "controlled buy was less than ideal" because the detective "did not follow the informant into the building and thus was unable to verify with certainty which apartment was the source of the drugs," the court upheld the search. *Id.*

Similar conclusions followed after similar searches. *See United States v. Garcia*, 983 F.2d 1160, 1166–67 (1st Cir. 1993) (finding probable cause where a detective watched an informant "enter the front door" of an apartment building and "observed him exit a few minutes later from the same door," after which the informant "handed [the detective] a quantity of cocaine, reporting that he had purchased" it from the unit to be searched); *United States v. Dukes*, 758 F.3d 932, 935 (8th Cir. 2014) (finding probable cause when a suspect took a confidential informant to a house and "brought crack cocaine back" three times "[a]fter going into the residence").

Analogous cases, in which defendants stop at their own property during or immediately before or after a drug transaction, support comparable experience-based inferences. When a defendant "drive[s] directly from" his or her house to a drug sale, *United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019), leaves his "home immediately prior to selling drugs," *United*

*States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007), "start[s] from her residence shortly before allegedly delivering drugs," *United States v. Bulgatz*, 693 F.2d 728, 731 (8th Cir. 1982), or sleeps at home "the evening after . . . collect[ing] proceeds from a drug sale," *United States v. Stearn*, 597 F.3d 540, 564 (3d Cir. 2010), a judge may have good reason to think evidence of drug sales might be found in the defendant's house.

Trying to counter this line of precedent, White invokes *United States v. Buffer*, 529 F. App'x 482 (6th Cir. 2013). But this unpublished decision does not provide the Rosetta Stone that he claims. Even aside from the reality that "the paper of unpublished decisions cannot escape the scissors of published decisions on point," *Keahey v. Marquis*, 978 F.3d 474, 480 (6th Cir. 2020), *Buffer* offers little assistance to White. In that case, officers received an anonymous tip that Buffer sold drugs from his home. *Buffer*, 529 App'x at 483. They observed several one-to-three-minute visits at the property, and one officer found marijuana in a car leaving the residence. *Id.* On this record, we found that the "anonymous tip was insufficiently corroborated." *Id.* at 485. Here, in contrast, we have the firsthand account of an undercover officer who asked to buy cocaine, then watched a suspected dealer walk into White's house before reemerging with the requested drugs. Twice.

Besides, the path of unpublished decisions has perils of its own. *United States v. Davison* considered whether an affidavit provided probable cause to search a property that the defendant had twice entered to complete a drug transaction. 766 F. App'x 232 (6th Cir. 2019). Although many controlled buys occurred in the case, we focused on just two to find a nexus between illegal drug deals and the searched house. One drug buy "required the informant to drive [the defendant] to" the house, where he "entered the home and came back out to complete the transaction in the driveway." *Id.* at 236. The other happened after officers watched as the defendant drove to the target house, entered, and left before meeting an informant to complete the sale. *Id.* at 236–37. The defendant argued that the affidavit did not support an inference that the home belonged to him, but we found that irrelevant. Due to the defendant's "observed movements entering and exiting" the property "in close temporal proximity to the controlled drug buys," the affidavit provided probable cause to search the house. *Id.* at 237.

What of the possibility, White adds, that Conkle already had the cocaine on him before going into White's house?  Or the possibility that the last sale depleted the supply of cocaine at White's house?  The affidavit, sure thing, does not eliminate either possibility.  But possibility is not the touchstone.  The question is whether there is a "fair probability" or a "common-sense" inference that the house contains cocaine.  *Gates*, 462 U.S. at 238.  Probable cause does not demand resolving each jot and tittle of metaphysical doubt.  *Florida v. Harris*, 568 U.S. 237, 243–44 (2013).  As a veterinarian or doctor or scientist might say, "when you hear hoofbeats, think horses, not zebras."  Siddhartha Mukherjee, *A.I. Versus M.D.*, The New Yorker (2017).  An issuing judge need not eliminate every alternative explanation to find a "fair probability" that contraband will be present.  *Gates*, 462 U.S. at 238; *see also Dukes*, 758 F.3d at 938 (upholding probable cause when officers did not search an informant "prior to the drug transactions").

*No-knock entry*.  White separately argues that police unjustifiably used a no-knock warrant to search his home.  Although the Fourth Amendment incorporates the common law rule that officers must knock and announce their presence before executing a warrant, *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995), an exception applies if officers face a threat of physical violence or if they seek evidence that might readily be destroyed, *id.* at 936.  Whether this affidavit sufficed to invoke the exception is an open question.  It will remain one.  Even if the police violated the knock-and-announce rule, suppression is not the appropriate remedy.  *See Hudson v. Michigan*, 547 U.S. 586, 594 (2006).  As *Hudson* explains, the key remedy for unjustified no-knock entries is an action under § 1983 for money damages, not exclusion of the evidence in a criminal proceeding.  *Id.* at 597–99; *see also id.* at 603 (Kennedy, J., concurring in part and concurring in the judgment).

We reverse and remand for further proceedings consistent with this opinion.