NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0123n.06

Case No. 23-4034

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Mar 04, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff - Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| WILLIAM SIMS | ) | O P I N I O N |
| Defendant - Appellant. | ) ) | |

Before: McKEAGUE, KETHLEDGE, and READLER, Circuit Judges.

**McKEAGUE, Circuit Judge.** William P. Sims was convicted and sentenced to 195 months in prison for drug and firearm offenses after a jury trial. He raises two issues on appeal. First, he argues that the evidence obtained from a search of his residence should have been suppressed because the search warrant lacked probable cause. Second, he claims that the district court violated his Sixth Amendment rights by limiting his ability to cross-examine a witness during trial. Because Sims's arguments lack merit, we AFFIRM.

**I.**

Sims appeared on law enforcement's radar after an informant, whom detectives used in the past, claimed to have purchased crack cocaine and heroin from Sims for a "long time." Affidavit, R. 30-1 PageID 130. The informant identified Sims in photographs, stated that Sims drove a red Ford Fusion with a temporary tag, provided detectives with Sims's cell phone number, and claimed

to have purchased drugs at Sims's residence on 3211 W. 121st Street ("the residence"). Upon receiving other general complaints of possible drug sales at the address, detectives decided to investigate further.

## A. The Investigation

Detective Robert Jorgenson surveilled the residence. He observed that it had two entrances: the front door (west-facing) and a side door (south-facing). Jorgenson witnessed Sims go in and out of the residence through the side door. He did not witness anyone else use that entrance. Jorgenson also observed the same red Ford Fusion with the temporary tag parked on the street in front of the residence. Furthermore, an anonymous "concerned citizen" confirmed that Sims lived in the upstairs unit of the residence. Affidavit, R. 30-1 PageID 131. This citizen also stated that they witnessed "heavy vehicle and foot traffic coming from that address at all hours of the day" which in the detectives' experience was consistent with drug trafficking. *Id.*

With the help of a paid informant—one they had successfully used in the past—the detectives organized two controlled buys. Both buys followed the same pattern: Detective Ryan McNamara met the informant at a predetermined location where he searched the informant and the informant's car to ensure they were free of drugs or money. He then gave the informant marked money to purchase drugs from Sims. Using the number the detectives previously received, the informant called Sims to agree on a meeting location. McNamara confirmed that the informant used the correct phone number, overheard the conversation, and noted the location where the transaction was to occur. He then followed the informant to the location and observed the transaction from a distance. In the meantime, Jorgensen would remain parked outside of the residence to observe and report on Sims's movements. After each buy, McNamara followed the

informant back to the predetermined location to retrieve the purchased drugs. According to the affidavit, detectives observed the following during the buys:

*First Buy*. Shortly after the informant placed the call, Sims drove[1] to the residence and entered it through the side door. A few minutes later, Sims exited the building through the side door and walked north towards the buy location, where the informant was already waiting in a car. Shortly after, Sims approached and entered the informant's car. The informant then drove towards the residence before Sims got out and walked back to the apartment. McNamara retrieved crack cocaine from the informant.

*Second Buy*. Detectives conducted the second buy within a week of the first. After the informant placed the call, Sims exited the residence through the side door and drove away in the same red Ford Fusion that was parked by the residence during detectives' initial surveillance. Several minutes later, Sims arrived at the buy location. The informant entered Sims's car and exited after approximately thirty seconds. Sims returned to the residence and entered through the side door. This time McNamara retrieved crack cocaine and heroin from the informant.

Within two days of the second controlled buy, detectives obtained a warrant to search the upstairs unit of the residence, which they executed two days later. The search unearthed narcotics, firearms, and drug paraphernalia.

## B. Procedural History

Based on the controlled buys and the evidence obtained during the search, a grand jury indicted Sims for distribution of and possession with intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) (counts 1, 2, 6, and 7), possession with the intent to

---

[1] The search warrant affidavit states that Sims arrived in a red Ford Focus, Affidavit, R. 30-1 PageID 131, but during his trial testimony, Jorgenson claimed to have observed a red Ford Fusion. Trial Tr. Vol 1, R. 99 PageID 790.

distribute a controlled substance under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (counts 3, 4, and 5), being a felon in possession of firearms and ammunition under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (count 8), and possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A) (count 9). The controlled buys formed the basis for the distribution charges in counts 1 and 2.

Sims filed several pretrial motions with the district court, three of which are relevant here. First, Sims moved to compel the government to disclose the identity and contact information of the informants referenced in the search warrant affidavit. The government refused, claiming that disclosing the identity would endanger the informant. The district court agreed with the government and denied the motion but also held that if the government proceeded to trial on counts 1 and 2, it would have to disclose the informant's identity to facilitate cross-examination.

Next, Sims moved to suppress all the evidence seized from the residence, claiming that the affidavit did not establish probable cause. He disputed the affidavit's characterization of the controlled buys and argued that the government failed to corroborate any of the information in the search warrant affidavit, and without the identity and ability to interview the informant involved in the buys, there was no way for Sims to refute the affidavit. The district court denied the motion during a suppression hearing explaining that Sims failed to provide any reasons to doubt the information in the affidavit. The court explained that the affidavit established probable cause and additional corroboration, although helpful, was not necessary in this case.

Finally, Sims moved to exclude all evidence of the controlled buys. He argued that if the government dropped counts 1 and 2, evidence of the controlled buys was no longer relevant to the remaining counts, and any testimony on the buys without the opportunity to cross-examine the informant would unduly prejudice Sims. The government eventually dropped counts 1 and 2. But

the court denied Sims's motion explaining that it would allow evidence of the controlled buys because they occurred less than a week before the search and were relevant to show Sims's knowledge of the charged crimes under Fed. R. Evid. 404(b).[2]

## C.  The Trial

The case proceeded to trial on the remaining counts, and both Jorgenson and McNamara testified. Jorgenson was the first to testify, but before he could get to the controlled buys Sims objected citing the same reasons he offered in his motion in limine. The court overruled the objection but gave a limiting instruction to the jury explaining that they were to use the information for the sole purpose of evaluating Sims's knowledge or intent for the crimes he was charged with. Jorgenson testified as to the details of how the controlled buys were set up and his personal observations during the controlled buys. Sims thoroughly cross-examined Jorgenson on the lack of any surveillance recordings, the reliability of the informants used in the investigation, and Jorgenson's observations during the controlled buys.

During McNamara's testimony, Sims objected again when the government began questioning McNamara on the controlled buys. The court warned the government that it did not want a reiteration of the controlled buys because Jorgenson already described them in detail. But the court did allow "very limited" inquiry into McNamara's observations of the controlled buys. Trial Tr. Vol. 4, R. 102 PageID 1350–52. On cross-examination, Sims questioned McNamara about events that occurred on November 10—six days before the first controlled buy—at which

---

[2] "Evidence of any other crime, wrong, or act is not admissible to prove a person's character . . . [but] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2).

point the government objected, the court called for a sidebar with Sims's counsel and the following

colloquy took place:

| | |
|---|---|
| The Court: | All right. Mr. Bryan [Sims's trial counsel], I limited over your -- it was because of your objection I limited this witness's testimony about things he did -- |
| Mr. Bryan: | Judge, I'm just -- |
| The Court: | -- before the search warrant, so you're opening the door to a whole lot of stuff that you wanted to keep out. |
| Mr. Bryan: | No, I'm not -- I'm just trying to set up the search warrant -- |
| The Court: | You don't need to set up the search warrant unless you want to open the things to the stuff that I left out. |
| Mr. Bryan: | Okay, Your Honor. |
| The Court: | All right. |
| Mr. Bryan: | That's fine. I'm not going to talk about the controlled buys or -- |
| The Court: | You're bringing out on November 10th. |
| Mr. Bryan: | Right. That was an interview of a witness. |
| The Court: | Well, I mean, if you want to go there, I'll let [the government] put in whatever [it] wants. And I don't think you want that, and I don't think Mr. Sims wants that. So let's focus this, please. |
| Mr. Bryan: | Okay, Your Honor. |

Trial Tr. Vol. 4, R. 102 PageID 1382–83. After this interaction, Sims refrained from questioning

McNamara about the events prior to the execution of the search warrant altogether.

The jury found Sims guilty on all counts and the court sentenced him to 195 months in

prison. This appeal followed.

## II.

Sims presents two issues on appeal. First, he claims that the district court erred in denying

his motion to suppress the evidence obtained pursuant to the search warrant. He argues that the

affidavit submitted in support of the search warrant did not establish probable cause because it did

not provide the requisite nexus between the trafficking activity and the place to be searched; failed

6

to establish the reliability of its sources; and lacked particularity as to the premises to be searched. Second, he claims that the district court violated his Sixth Amendment right to confrontation by limiting his ability to cross-examine McNamara during trial. We address each of these arguments.

**A.**

*Probable Cause*. Sims appeals the district court's denial of his motion to suppress arguing that the affidavit submitted in support of the search warrant did not establish probable cause. "We review de novo the district court's determination that the . . . affidavit in support of the warrant did not support a finding of probable cause." *United States v. Jones*, 817 F.3d 489, 490 (6th Cir. 2016).

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause for a search warrant exists "when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The judge issuing the warrant "make[s] a practical, common-sense decision whether" the information in the affidavit supports such a finding. *Id.* We afford "great deference" to such decisions, and as a reviewing court, we only ask "whether, under a totality of circumstances" the issuing judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000). We reverse only if we find that the issuing judge "arbitrarily exercised his or her authority." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013).

We find no such arbitrary exercise of authority here. The simple question is whether the affidavit gave the issuing judge a "substantial basis" to conclude there was a "fair probability" that a search of the residence would uncover evidence of drugs, drug-dealing, or firearms. It did. According to the affidavit, for each controlled buy, Jorgenson witnessed Sims leave the residence

shortly after the informant placed the call; McNamara witnessed Sims arrive at the buy location and conduct a transaction with the informant; McNamara retrieved drugs from the informant after each transaction; and Jorgenson witnessed Sims return to the residence immediately after completing the transaction. Such stops at the residence "immediately before or after a drug transaction" support the "common-sense" conclusion that there was a "fair probability" that drugs were located at the residence. *United States v. White*, 990 F.3d 488, 490, 492 (6th Cir. 2021). The fact that Sims had to briefly stop at the residence before meeting the informant during the first controlled buy only strengthens the inference that Sims had drugs stored there. *See id.* at 490. Put together, "[t]his evidence alone would end the matter." *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (en banc).

We do not break new ground with this conclusion. In *Sanders* we found probable cause to search an apartment under similar circumstances. *Id.* There, as here, in a span of a week, officers arranged for two controlled buys between an informant and the defendant. *Id.* For each buy, officers searched the informant and his car before the buy, gave the informant buy money, and observed the informant during the purchase at a predetermined meet location. *Id.* at 459. For the first purchase, officers witnessed the informant enter the defendant's car and exit moments later with heroin and fentanyl. *Id.* After the buy, officers tailed the defendant and saw that he drove straight to the apartment. *Id.* For the second buy, officers watched the defendant leave the apartment, drive to the buy location, sell drugs to the informant, and return straight to the apartment. *Id.* We found that these facts established probable cause to search the apartment. *Id.* at 463.

So too in *White*. There, an undercover agent—after asking the defendant where he could buy cocaine—watched the defendant walk into an acquaintance's house and emerge with three

grams of cocaine. 990 F.3d at 489. Over a month later, the agent again asked the defendant for cocaine, this time the defendant dropped the agent at a nearby alley and drove himself to the same house. *Id.* Another detective observed the defendant approach the house, exit his car, enter the house through the back, reemerge from the house, get back into the car, and travel back to the agent, where he completed the sale. *Id.* We found probable cause based on these facts. *Id.* at 490. Other cases likewise support this conclusion. *See, e.g.*, *United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019) (finding probable cause where detectives setup three controlled buys of cocaine and observed defendant drive directly from his condo to the site of the buy); *Jones*, 817 F.3d at 491 (finding probable cause after officer witnessed defendant leave the property, drive to the location of the controlled buy, and then sell cocaine to the confidential informant).

Sims arguments to the contrary are unpersuasive. First, he repeatedly claims that the search warrant affidavit here did not establish that detectives continuously observed Sims between his home and the meeting location. Appellant Br. 23–25. This argument misses the forest for the trees. Probable cause only requires "reasonable grounds to believe that contraband will be located on the property to be searched." *Sanders*, 106 F.4th at 461 (citation omitted). And "evidence that one leaves a residence, engages in a drug transaction, and then returns into the residence plainly demonstrates a sufficient nexus with the location." *Id.* at 463 (cleaned up). Regardless of whether Sims was constantly within the detectives' view, the affidavit establishes that for each controlled buy, Sims went straight to the buy location from the residence and returned immediately after the transaction, thereby supplying the required nexus with the residence. The mere possibility that detectives might not have had eyes on Sims for a brief period while Sims was headed towards or returning from the buy location does not take away from this common-sense conclusion. Overall,

the affidavit undeniably provides "reasonable grounds" to conclude that Sims had drugs stored at the residence. *Id.* at 461.

Sims next challenges the reliability of the sources. He argues that the affidavit lacked probable cause because detectives relied on information from several informants whose reliability the affidavit failed to establish. Appellant Br. 21–22. Sims's argument fails because it assumes the detectives "conducted a search based on [the] informant's tip alone." *Jones*, 817 F.3d at 492. But in reality, "the warrant was based on [the detectives'] own observations more than it was the informant[s']." *Id.* According to the affidavit, detectives received the following information from the informant: Sims sold drugs at his residence; Sims drove a red Ford Fusion with a temporary tag; and Sims accepted drug orders using his cell phone. The detectives' investigation sufficiently corroborated this information. Detectives made an informant initiate the buys by calling the phone number they previously received. They observed the red Ford Fusion parked on the street in front of the residence and witnessed Sims use it during the second controlled buy. For each buy, they observed Sims leave the residence, complete the transaction, and return to the residence. Because of these corroboration efforts, the detectives' observations alone would have established probable cause. *Id.* at 491.

*Particularity*. Sims also challenges the warrant's particularity but frames the argument as a challenge to probable cause. He argues that the warrant lacked probable cause because it did not describe the place to be searched with sufficient particularity. Appellant Br. 14–18. Since Sims did not raise particularity at the district court, we review for plain error.[3] *United States v. Blair*, 214

---

[3] A quick note on the standard of review is in order. Normally, "[w]e review [a] warrant's particularity de novo." *United States v. Kirtdoll*, 101 F.4th 454, 456 (6th Cir. 2024). However, a defendant who fails to argue particularity as a basis for suppression at the district court, waives the right to raise it on appeal, and we review the issue for plain error. *Blair*, 214 F.3d at 697 (citing *United States v. Critton*, 43 F.3d 1089, 1094 (6th Cir. 1995)); *United States v.*

F.3d 690, 697 (6th Cir. 2000). To prevail on plain error, Sims must show that there was an "obvious or clear" error that affected his "substantial rights" as well as "the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (cleaned up) (citations omitted). This is a "difficult" standard to meet. *United States v. Jackson*, 918 F.3d 467, 482 (6th Cir. 2019) (citations omitted). And we reverse only when the district court was "derelict in countenancing" the error. *United States v. Ramamoorthy*, 949 F.3d 955, 960 (6th Cir. 2020) (citations omitted).

The Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched." U.S. Const. amend. IV. To satisfy this requirement, a warrant must include enough detail to allow executing officers to "locate and identify" the search premises with "reasonable effort." *King*, 227 F.3d at 750. When dealing with a multi-unit structure, as here, the warrant must provide enough information to prevent a search of any units for which there is no probable cause. *United States v. Crumpton*, 824 F.3d 593, 614 (6th Cir. 2016). Such a warrant is "void" if it describes an entire building when probable cause exists to search only one unit. *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1976). Even so, the particularity requirement does not "mandate perfection" but merely ensures that the warrant does not create a "reasonable probability" that officers could mistakenly search the wrong premises. *Kirtdoll*, 101 F.4th at 456. And mere "technical inaccuracies" do not render searches pursuant to the warrant unconstitutional. *Knott v. Sullivan*, 418 F.3d 561, 569 (6th Cir. 2005).

---

*Pritchett*, 749 F.3d 417, 436 (6th Cir. 2014). Sims does not deny he did not challenge particularity at the district court. Instead, on appeal, he argues that his motion to suppress included a particularity challenge because particularity is "part and parcel" of probable cause. Reply Br. 6. Contrary to Sims claim, the probable cause and particularity requirements have distinct roles. While probable cause establishes the basis for a search, particularity curbs its breadth. *United States v. Nester*, No. 23-1727, 2024 WL 4615777, at *2 (6th Cir. Oct. 30, 2024).

Here, the warrant and the supporting affidavit describe the place to be searched with sufficient particularity. Begin with the warrant's description of the building. It describes it as a "Two-Story, Multi unit Dwelling" located at "3211 W.121st St (Up)" and notes that it is on the "East side of W 121 St, North of Triskett Ave." Warrant, R. 30-1 PageID 127. It also describes the building as having "White Vinyl siding and brown trim with the numbers 3211 marked vertically to the right of the west facing front door." *Id.* Detectives would have no difficulty locating and identifying the building based on this information.

The affidavit, which was fully incorporated into the search warrant, further narrows the search area. First, it directs the detectives to only search the upstairs unit by stating that the unit to be searched is "more particularly described as 3211 W.121st St (Up)." Affidavit, R. 30-1 PageID 129. It also states that anonymous sources confirmed that Sims lived in the upstairs unit of the building. It also provides that an informant, who purchased crack and heroin from Sims at this location, observed Sims "coming and going from the side door of the house" during the purchases. *Id.* at PageID 131. Furthermore, it explains that Jorgenson witnessed Sims entering the residence through the side door during his brief stop at the residence before the first buy. *Id.* He also witnessed Sims leave and return to the residence through the side door before and after the second controlled buy. Put together, this information directs the detectives to search only the upstairs unit—where Sims allegedly kept evidence of drug crimes—and instructed that they could access this unit through the side door of the building. This conclusion is only strengthened by the fact that McNamara was both the warrant's affiant and the executing officer, ensuring that detectives would not search the wrong premises. *See United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998). Since the warrant and supporting affidavit sufficiently describe the place to be searched, the district court did not commit any error, plain or otherwise.

We find Sims's counterarguments unconvincing. He argues that the affidavit fails the particularity requirement because it does not specify what a person would encounter after entering the side door. Appellant Br. 18. He states that since an informant claimed to have bought drugs at the apartment, detectives should have inquired and included more information from the informant regarding the layout. *Id.* at 19. The problem with this argument is that it focusses on what the affidavit lacks. True, additional information about the layout and what exactly the detectives would have encountered upon entering the side door would only strengthen the affidavit, but a "line-by-line scrutiny" of the affidavit almost always tends to reveal unanswered questions and unresolved issues. *United States v. Thomas*, 605 F.3d 300, 309 (6th Cir. 2010). We therefore judge the adequacy of an affidavit on "what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). In this case, we need not dwell on what the warrant lacked, because it contained enough detail for detectives to "locate and identify" Sims's upstairs unit with "reasonable effort" which is all that is required for particularity. *King*, 227 F.3d at 750.

Sims also notes a purported structural discrepancy in the warrant. He points out that the warrant initially describes the search premises as "3211 W.121st St (Up)" but goes on to authorize a search of "3211 W.121st St." *See* Warrant, R. 30-1 PageID 127–28. He claims that the omission of "(Up)" creates a general warrant authorizing a search of the entire structure. Appellant Br. 15–16. We disagree because when "[r]ead as a whole" the warrant indicates that the detectives could only search the upstairs unit of the building. *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018) (holding that the warrants at issue satisfied the particularity requirement because when read as a whole, they limited officers' search to evidence related to aggravated burglary). The omission is a technical inaccuracy at best and does not render the warrant "so flawed" as to create a

"reasonable probability" that detectives would search the entire structure. *Kirtdoll*, 101 F.4th at 456.

***

Because we find that the search warrant complies with the Fourth Amendment, we need not reach the applicability of the good faith exception. *Durk*, 149 F.3d at 466.

**B.**

We now turn to Sims's second claim: whether the district court's limitation of Sims's cross-examination of McNamara violated Sims's Sixth Amendment right to confrontation. Appellant Br. 41. Sims argues that by limiting his cross-examination, the district court prevented his ability to elicit facts that would have allowed the jury to conclude that the controlled buys never happened. Appellant Br. 46. We review a district court's limitation on cross-examination for abuse of discretion. *United States v. Ralston*, 110 F.4th 909, 916 (6th Cir. 2024) (citing *United States v. Callahan*, 801 F.3d 606, 623 (6th Cir. 2015)).

Under the Sixth Amendment's Confrontation Clause, a criminal defendant has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right to confront includes the opportunity to cross-examine those witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Importantly, this is "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 679. And judges have "wide latitude" to "reasonabl[y] limit[]" cross-examination to avoid "harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." *Id.* Such limits do not compromise the Sixth Amendment as long as "cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias." *Callahan*, 801 F.3d at 624 (citation omitted). "The key issue is whether the jury

14

had enough information to assess the defense's theory of the case despite the limits placed on cross-examination." *Id.* (citation omitted).

The district court's limitations did not deprive the jury of information necessary to assess Sims's theory of the case. The court allowed the government to question Jorgenson about the controlled buys for the limited purpose of showing Sims's knowledge of the other crimes with which he was charged. Thereafter, the court allowed Sims to cross-examine Jorgenson. The court also gave the jury a limiting instruction explaining that they were supposed to use the information for the sole purpose of evaluating Sims's knowledge or intent. Similarly, when McNamara got on to the stand, the court offered the government the "very limited" opportunity to question McNamara about his observations of Sims's interactions with the informant during the controlled buys, explaining that there was no need to go through the details of the controlled buys again. Trial Tr. Vol. 4, R. 102 PageID 1351–52.

The only arguable limitation on cross-examination came when the court interrupted Sims's questioning of McNamara. Read out of context, the district court's statements could be seen as excluding core impeachment evidence—McNamara's personal observations of the controlled buy. But the court did not tell Sims he could not ask his question. It merely warned him that probing the circumstances of the pre-search-warrant investigation would allow the government to present its own, hitherto excluded evidence regarding that investigation. And more to the point of Sims's argument on appeal, this warning was in response to Sims's question about a witness McNamara interviewed on November 10, six days before the first controlled buy. Nothing in the court's admonition prevented Sims from questioning McNamara about his observations during the later controlled buys. Sims did not even attempt such a line of questioning after the ruling. Since the

district court's warning did not preclude any information from which the jury could have assessed McNamara's credibility, we find no abuse of discretion. *See Ralston*, 110 F.4th at 917–18.

## IV.

We AFFIRM the district court's judgment.