NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0014n.06

Case No. 25-1067

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) ) | **FILED**<br>Jan 07, 2026<br>KELLY L. STEPHENS, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| MICHAEL WARREN SMITH, JR., | ) ) | |
| Defendant - Appellant. | ) ) | OPINION |

Before: GIBBONS, STRANCH, and DAVIS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Defendant Michael W. Smith, Jr. pled guilty to possession with intent to distribute methamphetamine, fentanyl, and cocaine, after police executed search warrants at two properties associated with him. The affidavit supporting the searches stated that after months of investigating Smith and other drug dealers with whom he associated, law enforcement established that Smith was a large-scale Kalamazoo-based drug dealer and supplier who regularly frequented the locations searched. These conclusions were drawn from controlled purchases by known confidential informants, ongoing investigations, first-hand observations, GPS tracker data, phone and rental property records, surveillance footage, and anonymous tips. The supporting affidavit also contained significant corroborating evidence regarding several drug transactions in which Smith personally engaged involving the properties searched. On appeal, Smith argues that the district court erred in denying his motion to suppress because the search warrants were not supported by probable cause and lacked a nexus between the properties searched and the evidence sought. We affirm the district court's judgment.

## I.

Based on information gathered by confidential informants and law enforcement, Smith was known as a large-scale methamphetamine supplier in Kalamazoo. In March 2023, when executing an unrelated search warrant, Kalamazoo Valley Enforcement Team ("KVET") officers learned that a known drug dealer[1] "in possession of distribution amounts of crack cocaine" had been communicating with Smith. DE 38-1, Search Warrant #1 Aff., Page ID 119. A month later, KVET uncovered text messages between another Kalamazoo-based drug dealer who sold "large quantities of methamphetamine" and an individual named "JR" where they discussed drug trafficking.[2] *Id.* at Page ID 113. Since at least 2021, KVET has known that "JR" refers to Michael Warren Smith Jr.[3]

In June 2023, KVET received an anonymous tip alleging that Smith was involved with impending shipments of drugs and guns from Texas to Michigan, and that the contraband would be stored at 822 Elmwood Avenue ("Elmwood"). A couple of weeks later, Investigator Jeff Salmon, a public safety officer assigned to KVET,[4] obtained a search warrant to track a rental car driven by Smith. The rental car's GPS history ultimately revealed that it "consistently stopped at

---

[1] This drug dealer was observed months later at one of the properties searched (Elmwood), where he briefly interacted with Smith.

[2] An excerpt from that drug dealer's messages with Smith reads as follows: "My man I need your help please[.] I am having a hard time with life since I got out of jail . . . Some of what you gave me is straight up but the bigger cloudy pieces . . . [are] going to fuck me up because my people and I just tried it and it burns rough and taste[s] horrible. . . . I need you to please trade me out so I can make my money . . . otherwise I'm stuck . . . and now my people won't take it." DE 38-1, Search Warrant #1, Page ID 113-14.

[3] In 2021, a confidential informant was "shown a photograph and positively identified 'JR' as Michael Warren Smith." *Id.* at Page ID 114.

[4] Salmon, a police officer for over 11 years, stated that he had ample experience, having been "involved in investigating over 400 cases involving controlled substances" and "written numerous search warrants/affidavits." *Id.* at Page ID 113.

822 Elmwood[.]" DE 38-1, Search Warrant #1 Aff., Page ID 116. Around this time, a confidential informant claimed that Smith "was continuing to sell large quantities of methamphetamine." *Id.*

During the investigation of another drug dealer, Lee Curtis Gibbs, KVET found Smith's phone number (saved as "JR") in Gibbs's phone records, specifically in a digital money transfer application—Cash App. In July 2023, a different confidential informant indicated that Smith was Gibbs's methamphetamine supplier. In August 2023, KVET tracked Gibbs's vehicle to Kalamazoo. Later that day, KVET observed a Chrysler,[5] previously seen in the Elmwood area, pull up directly behind Gibbs's vehicle. Police observed Gibbs approach the Chrysler's front passenger door, take "objects" from the car, put those "objects down the front of his shorts," and then return to his vehicle and leave. *Id.* at Page ID 117. Subsequently, the Chrysler made a brief stop at 823 N. Church Street,[6] before parking at Elmwood, where Smith was identified as the driver.[7]

On September 7, 2023, while KVET was surveilling Elmwood, a female entered through the front door of the residence. A short time later, the female left and was observed holding what looked like a "small white object," which the officer believed to be cocaine or crack cocaine. *Id.* at Page ID 120. Later that month, GPS tracking revealed that the Chrysler headed to an apartment complex on West Main Street almost daily and sometimes more than once a day. A search warrant was then issued to install surveillance technology in the building's common hallway "to identify

---

[5] Although the Chrysler was regularly driven by Smith during the period he was investigated, state vehicle records show the vehicle was not registered to him, but to an individual named Tiyonna Shantel Ford.

[6] KVET was aware that Latasha West, Smith's girlfriend, lived at this address, and that Smith would often stay there overnight.

[7] That same day, a search warrant was issued to track the Chrysler.

the specific apartment Smith was frequenting." *Id.* at Page ID 122. KVET's investigation revealed that Smith had key access to Apartment #33.

Around the same time, KVET executed a search warrant to track the vehicle of Raydon Henry, who was also being investigated for selling large quantities of narcotics in Kalamazoo. Since Smith was suspected of supplying narcotics to Henry, KVET started tracking their interactions.[8] As a result, whenever Smith and Henry's GPS trackers were in proximity to each other, an alert was sent to KVET.

Based on GPS data from September and October 2023, the affidavit highlights at least five suspected drug transactions that took place between suspected drug dealers—Henry, Gibbs, and Smith—involving Apartment #33 and Elmwood. Henry and Smith met three times. Their first encounter took place on September 3, 2023 and it involved Smith leaving Elmwood with a gold-colored backpack, driving his Chrysler directly to meet Henry, parking their vehicles close to each other, and leaving at the same time shortly afterwards. The second encounter took place approximately three weeks later, when Smith was again observed leaving Elmwood but making a brief stop at Apartment #33 before driving his Chrysler to a café and parking directly next to Henry's vehicle. Shortly thereafter, both vehicles were seen leaving simultaneously, and Smith was surveilled driving back to Elmwood. KVET was alerted to this encounter because Smith's and Henry's GPS trackers were in close proximity.[9]

---

[8] According to phone tolls obtained by law enforcement, Henry was identified as one of several individuals that Smith contacted between May and August 2023. Another individual identified in Smith's phone tolls was Roy Bush Jr., known to law enforcement as a seller of "large quantities of methamphetamine." DE 38-1, Search Warrant #1, Page ID 118.

[9] This was the third alert sent to KVET. The first alert was sent on September 1, 2023, at a gas station known as "a common place for subjects to sell narcotics." *Id.* at Page ID 119–20. The second was sent two days after that, when Smith's Chrysler was observed leaving Elmwood and heading directly to an apartment complex, where Henry also drove from his residence. After

The last recorded encounter between Henry and Smith occurred approximately two weeks later, prior to a controlled purchase between Henry and a confidential informant. In this instance, KVET conducted a controlled purchase through a confidential informant who "purchased a quantity of methamphetamine in exchange for [cash]." *Id.* at Page ID 125. Beforehand, KVET had observed Smith leaving Elmwood in the Chrysler. Smith was then tracked to a location on Heatherdowns Lane, where Henry was seen walking out of an apartment and getting into the Chrysler's front passenger seat. Henry was then observed getting out of the Chrysler "with his left hand in the front coat pocket" and walking back to Heatherdowns Lane, while the GPS tracked Smith returning directly back to Elmwood in the Chrysler.

Gibbs and Smith met twice in October 2023. The first meeting took place early in the month, while KVET was surveilling Smith. Based on a confidential informant's tip, Gibbs "was going to meet up with his supplier to get more methamphetamine." *Id.* at Page ID 122. Smith was seen walking out of Elmwood with a gold-colored backpack and a suitcase. He then drove to Apartment #33 and entered with the backpack. Smith stayed briefly and returned to the Chrysler with the same backpack in hand. KVET then observed Smith parking around the corner from a Mexican chain restaurant, next to a black Ford. Gibbs reached into the front passenger seat of Smith's Chrysler and, "after a short contact," got into the back seat of the Ford. Both vehicles left at the same time. Smith drove directly back to Elmwood and went inside upon arrival.

Shortly after Gibbs's and Smith's encounter, Smith left Elmwood in the Chrysler and drove to West Main Street. Smith entered the building[10] and stayed for approximately forty minutes

---

Henry arrived and parked, Smith drove over in his Chrysler, parked directly beside Henry's car, and left moments later.

[10] During this specific instance, Smith was seen keying into Apartment #33 and letting in an individual that law enforcement believed was Carlton Ballard. Based on a prior investigation and

before departing in the Chrysler. Smith was then observed "bringing in the gold Gucci style backpack and suitcase into the apartment," but walked out with just the gold backpack. *Id.* at Page ID 122. Smith subsequently returned to the restaurant parking lot, where a Jeep Cherokee parked next to him for a "very short amount of time." *Id.* at Page ID 123. Given how the vehicles were positioned, investigators were unable to explicitly see a "hand-to-hand transaction," but KVET identified Gibbs as the Jeep's driver. *Id.* KVET then observed Gibbs "looking down into his lap as if he w[ere] looking at something," and leaving. *Id.* Smith left shortly afterwards and returned to Elmwood, where he keyed himself into the residence.

After Smith and Gibbs met for a second time, Gibbs was involved with a controlled purchase where he was observed taking "methamphetamine out of his front hoodie pocket and turn[ing] it over to" a confidential informant. *Id.* at Page ID 124. Before the controlled purchase, KVET had seen Smith leave Elmwood and drive to a gas station in his Chrysler. An investigator "observed Gibbs park in front of Smith's vehicle in the parking lot" and "get into the backseat of Smith's Chrysler[.]" *Id.* Subsequently, KVET surveilled Smith going directly from the gas station to West Main Street, where he was later seen "keying into apartment 33." *Id.* Smith remained in the apartment for a short time and drove back to Elmwood shortly thereafter.

Based on this information, a state judge signed two search warrants on October 10, 2023, for (1) Smith's residence (Elmwood) and (2) an apartment deemed as his drug stash location (Apartment #33). Each warrant was supported by a sixteen-page affidavit[11] containing detailed allegations, claims supported by GPS data, and observations based on intelligence gathered by a

---

history, law enforcement knew Ballard as "a large-scale drug dealer." DE 38-1, Search Warrant #1, Page ID 123.

[11] Given that the affidavits attached to each search warrant are virtually identical, we will refer to them jointly as "the affidavit" for ease of reference.

team of cooperating defendants, confidential informants, investigators, officers, and tipsters. The next day, law enforcement executed both search warrants. The searches yielded multiple firearms and a significant quantity of controlled substances on Smith and the properties' premises.

At the time the search warrant was executed at Elmwood, Smith was found by himself. Smith waived his *Miranda* rights and stated that he lived alone at the residence. He had two bags of fentanyl on him, weighing about 185 grams. Investigators also found about $9,000.00 in cash (of which approximately $2,000.00 were "controlled buy" money), along with 388 grams of methamphetamine and drug packaging materials.

During the execution of Apartment #33's search warrant,[12] no one was on the premises. In one of the bedrooms, officers located approximately five pounds of methamphetamine, 473 grams of cocaine, and over 500 grams of fentanyl. The investigators also found cutting agents, bowls with drug residue, latex gloves, plastic baggies, and a hydraulic press. Investigators also located five loaded firearms and ammunition inside a hamper. Investigators believed Apartment #33 was a drug stash apartment because "nobody lived there" and found that "there was no clothing, only a few pairs of shoes," and one of the two bedrooms did not have a bed. DE 51, Final Presentence Report, Page ID 232.

In December 2023, a grand jury returned a three-count indictment against Smith, charging him with two counts of possession with intent to distribute controlled substances (Counts I & II), pursuant to 21 U.S.C. § 841, and one count for being a felon in possession of a firearm (Count III), pursuant to 18 U.S.C. §§ 921(a), 922(g)(1), and 924(a)(8). In August 2024, Smith moved to suppress the evidence seized in the searches of the Elmwood residence and Apartment #33. Smith

---

[12] Apartment #33 is a unit in a multi-family residential building at 4517 West Main Street, Kalamazoo, MI 490007.

argued that the searches violated his Fourth Amendment rights because the affidavits failed to establish a nexus between his alleged criminal activity and the locations searched. Smith also argued that the good-faith exception should not apply because the warrants were "so lacking in indicia of probable cause" that it was objectively unreasonable to rely on the accompanying affidavit. DE 38, Mot. to Suppress, Page ID 105, 108.

In October 2024, the district court denied Smith's motion, finding that the information in the affidavit had established a basis for probable cause because there was sufficient evidence connecting Smith's alleged criminal activity to the locations searched. Given this finding, the district court did not deem it necessary to reach the good-faith issue under *United States v. Leon*, 468 U.S. 897 (1984). A few days later, Smith entered into a plea agreement, in which he agreed to plead guilty to Count II in exchange for having Counts I and III dismissed. One of the terms in Smith's guilty plea was that he would "give[] up his right to appeal his conviction on any ground" except for a court's ruling on a "motion to suppress evidence." DE-42, Plea Agreement, Page ID 178. The district court accepted Smith's guilty plea.[13]

Smith's Presentence Investigation Report calculated an advisory guideline range of 360 months to life in prison following his guilty plea. In January 2025, Smith moved for a downward variance. The district court ultimately sentenced Smith to 327 months imprisonment, followed by five years of supervised release, and ordered him to pay a criminal monetary penalty. The next

---

[13] Count II of Smith's indictment stipulates that he "knowingly and intentionally possessed with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, and cocaine, a Schedule II controlled substance, seized from an apartment on W. Main Street, Kalamazoo, Michigan." DE 1, Grand Jury Indictment, Page ID 2.

day, Smith filed a timely notice of appeal seeking review of the district court's denial of his motion to suppress. We have jurisdiction under 18 U.S.C. § 1291.

## II.

When reviewing the denial of a motion to suppress, the defendant faces at least two hurdles. *United States v. Simmons*, 129 F.4th 382, 386 (6th Cir. 2025). "First, 'we consider the evidence in the light most favorable to the government.'" *Id.* (quoting *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024)). "Second, our review of the probable cause determination is the second level of review." *Id.* Accordingly, "we are deferential to probable cause determinations below; recognizing that they 'take[] place on the front lines.'" *Id.* (quoting *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc) (citation modified)). On appeal, "we are mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant." *Sanders*, 106 F.4th at 461. And "[w]ith great deference toward the issuing judge's determination [that] federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021).

Thus, "we may only reverse a magistrate's decision to grant a search warrant if the magistrate arbitrarily exercised his or her authority." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013). To be clear, as the reviewing court, we are "not permitted to attempt a de novo review of probable cause; the issuing judge's decision should be left undisturbed if there was a 'substantial basis' for the probable-cause finding." *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)).

**III.**

Under the Fourth Amendment of the U.S. Constitution, a search warrant can only be issued upon "probable cause." U.S. Const. amend. IV. In considering whether probable cause exists, a reviewing court asks whether the government has successfully shown a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). Such a nexus "exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Sanders*, 106 F.4th at 461 (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). Our review of probable cause "is limited to the information presented in the four-corners of the affidavit." *United States v. Sumlin*, 956 F.3d 879, 885 (6th Cir. 2020) (citation modified).

This is "not a difficult standard to meet." *United States v. Whitlow*, 134 F.4th 914, 919 (6th Cir. 2025). Thus, in the search warrant context, "it follows that a warrant's validity should not turn on whether it is supported by an 'actual showing' of criminal activity at the targeted location," but instead on "whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *Sanders*, 106 F.4th at 462 (citation modified). Accordingly, we consider the "totality of the circumstances" rather than "scrutinize a warrant affidavit in a hypertechnical or line-by-line manner." *Id.* at 463 (citation modified). In short, this analysis is "holistic." *Id.* Here, the supporting affidavit cleared the modest probable cause bar.

Under our precedent, probable cause exists when an affidavit contains "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence[.]" *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016). Here, the supporting affidavit established

*more* than a sufficient nexus between Smith's drug-dealing activities and the properties searched. This evidence included police surveillance, phone records, and GPS data that documented several brief meetings between Smith and other suspected (as well as known) drug dealers, a confidential tip stating that drugs were being stored at Elmwood, and surveillance footage identifying suspected drug activity at Apartment #33 and Elmwood.[14] Thus, the affidavit plainly provides more than *sufficient* reliable evidence linking Smith's illicit activities to both properties.

Still, Smith argues that "[t]here was no information contained in the search warrant affidavits that a confidential informant had been inside the apartment or house, had observed evidence consistent with drug trafficking in the apartment or house, or that the confidential informant had seen [him] engaged in any of the alleged drug trafficking at all." CA6 R. 14, Appellant Br., at 26. Smith further argues that the affidavit does not establish probable cause because the "information in the affidavit was from evidence obtained away from the properties." *Id.* First, this argument is factually inaccurate because Smith was involved in at least two controlled purchases and several encounters with other drug dealers involved coming from or going to the properties at issue. Second, we also find this argument unpersuasive because probable cause "requires only a probability or substantial chance of criminal activity, not an *actual showing* of such activity." *Tagg*, 886 F.3d at 585 (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)) (emphasis added). Notably, "[i]n determining probability, officers and magistrates may rely on '*common-sense conclusions about human behavior*.'" *Id.* (quoting *Wesby*, 583 U.S. at 58) (emphasis added). KVET and the issuing judge did just that. While under surveillance, Smith

---

[14] It should be noted that surveillance footage was available because the affiant had "obtained a search warrant to enter onto the premises of 4515 W. Main St and place surveillance technology within the common hallways of the apartment complex" and "had a pole camera set up" that captured surveillance footage from 822 Elmwood Ave. DE 38-1, Search Warrant #1 Aff., Page ID 120, 122.

was observed engaging in several "short contact" transactions with suspected and known drug dealers, consistent with drug transactions. All probable cause "requires is a fair shot of finding contraband." *United States v. Higgins*, 141 F.4th 811, 816 (6th Cir. 2025). No "ironclad evidence that contraband will be present" is necessary "before [the police] conduct a search." *Id.*

Smith then alleges that the supporting affidavit "relied heavily on confidential informant information about [him] and others" as well as "surveillance conducted of [him] involving individuals known to law enforcement as drug dealers." CA6 R. 14, Appellant Br., at 26. But Smith does not cite any caselaw indicating that an affidavit that relies *heavily* on confidential informants or surveillance renders it deficient or invalid. And in any case, "a sufficiently reliable tip can help establish probable cause." *Sanders*, 106 F.4th at 464. Here, a tipster explicitly stated that they "were sure that" there were "narcotics and guns being stored at [Elmwood]." DE 38-1, Search Warrant #1, Page ID 115. Indeed, Smith does not contest the reliability of the confidential informants' statements, only that they were relied on at all.

Next, Smith argues that the affidavit contained "incomplete information" and thus, "lacked probable cause." CA6 R. 14, Appellant Br., at 23. Smith posits that his controlled buys "involved a third-party confidential informant purchasing a controlled substance from 'middle-men' and not [him]." *Id.* Specifically, Smith claims that the "description in the affidavit did not include basic information necessary to confirm [his] involvement in the controlled buy" and that this "undermine[s] the reliability of the information contained in the affidavit." *Id.* To support his argument, Smith cites our decision in *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), where we invalidated a search warrant in part because the controlled buy involved a third party. *Id.* at 29. However, the facts underlying *Hython* are distinguishable from those here.

In *Hython*, the supporting affidavit did not identify when the controlled buy took place, and we therefore acknowledged that "[b]ecause probable cause has a durational aspect, at least some temporal reference point is necessary to ascertain its existence." *Hython*, 443 F.3d at 486. Accordingly, we held that since "a well-trained officer could not reasonably rely on th[at] affidavit, given that it was based on one undated, acontextual controlled buy," the warrant "was invalid due to staleness." *Id.* at 489. In *Hython*, the lack of temporal information was our most important consideration. *Id.* at 486. Here, the controlled buys occurred just a couple of days before the execution of the search warrants on October 11.

And although we agree with Smith that the information in the affidavit regarding the second controlled buy does not clearly establish that the confidential informant was definitively involved in a controlled buy with him, this does not change our conclusion. Even if we were to discount this controlled buy completely from our analysis for vagueness,[15] we have nonetheless held that cases "with *just one* controlled buy, have [] met the probable cause bar." *United States v. White*, 990 F.3d 488, 491 (6th Cir. 2021) (emphasis added). And most importantly, we have also upheld a finding of probable cause where a controlled purchase was made through an intermediary. *See id.* ("Even though officers used an additional middleman as an *intermediary* between the confidential informant and the suspect residence, the affidavit passed the probable cause test." (citation modified)). Here, the affidavit details how Smith left Elmwood and sold drugs to Gibbs immediately before the controlled buy, after which he returned to Apartment #33. This raises the "common-sense inference and a fair probability" that the drugs sold to the confidential informant came from the locations searched. *White*, 990 F.3d at 490 (citation

---

[15] We have held that if the facts in a search warrant's affidavit are too vague, they cannot establish probable cause. *See Brown*, 828 F.3d at 382.

modified). Thus, we find Smith's argument that the "lack of controlled buys actually involving [him] significantly undercuts the finding of probable cause," CA6 R. 14, Appellant Br., at 30, unavailing.

Smith insists that "the controlled buys presented in the search warrants are unreliable and do not support probable cause to search the two locations." *Id.* at 1. But the supporting affidavit provides details of several other instances when Smith was observed arriving or leaving both locations and engaging in "short contact" interactions with known and suspected drug dealers, consistent with drug transactions. The supporting affidavit hardly relies solely on these controlled buys. *See United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc). "When it comes to probable cause, 'the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation.'" *Id.* (quoting *Wesby*, 583 U.S. at 60–61).

In sum, the supporting affidavit here contained sufficient information to establish a "fair probability" that evidence of drug activity would be found at the properties searched. *Sanders*, 106 F.4th at 461 (citation modified). And because our analysis is holistic and focused on the totality of the circumstances as presented in the affidavit, we will not disturb the district court's findings. *See id.* at 462–63, Furthermore, "[b]ecause we find that the warrant was supported by probable cause, we need not address the issue of whether the good faith exception would apply." *United States v. Dyer*, 580 F.3d 386, 393 (6th Cir. 2009).

## IV.

For the foregoing reasons, we affirm the judgment of the district court.