RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LAMON DAVID SIMMONS,

*Defendant-Appellant*.

No. 24-1057

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cr-00177-1—Jane M. Beckering, District Judge.

Argued: February 7, 2025

Decided and Filed: February 24, 2025

Before: THAPAR, NALBANDIAN, and RITZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant.
Kathryn M. Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for
Appellee. **ON BRIEF:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for
Appellant. Kathryn M. Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids,
Michigan, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which THAPAR, J., concurred,
and RITZ, J., concurred in the judgment. RITZ, J. (pp. 13–14), delivered a separate concurring
opinion.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  Lamon Simmons was living in one home and dealing cocaine out of another.  Following an eight-month investigation involving confidential buys by a reliable informant and regular surveillance of Simmons, the police got a warrant to search both homes.  Simmons now claims that the search of his primary residence was unconstitutional because the warrant lacked probable cause.  He argues that the police did not establish a nexus between his home and his drug activity.  Because the warrant affidavit sufficiently detailed Simmons's ongoing drug trafficking and the likelihood that records of that trafficking would exist in his home, we affirm.

**I.**

In April 2022, Officer Stoddard of the Grand Rapids Vice Unit began investigating Lamon Simmons based on a tip from a confidential informant.  The informant had been working with the Vice Unit for over a year and "was made reliable and credible" through three "reliability buys."  R.50-3, Aff. for Search Warrant, p.2, PageID 203.  Since then, the informant had made several other controlled buys for the Vice Unit, and all have tested positive for controlled substances.  The informant had also given the Vice Unit information on several other traffickers in the community.  And the unit had verified that information through other means, including police records, personal observations, and other reliable informants.

Stoddard showed the informant a photo of Simmons and the informant confirmed that Simmons sold cocaine in the Grand Rapids area.  The informant claimed to have known Simmons for over a year and provided Stoddard with a phone number Simmons used for drug transactions.  Stoddard then arranged for the informant to do multiple controlled buys with Simmons. On each of the buys, the informant contacted Simmons and arranged a meeting spot, price, and amount of cocaine to buy.  The informant then met Simmons and bought the drugs. After each buy, officers tested the drugs and confirmed they were cocaine.  Officers also watched Simmons conduct the transaction and followed him afterward.  He would typically go

from the buy to a house on Holly Street, enter briefly, and then continue to a home on Weatherwood Drive.

Stoddard believed the Weatherwood Drive home was Simmons's primary residence. Hours of surveillance confirmed Simmons would come and go often and park his cars in the home's garage. Stoddard also found multiple public and law enforcement records listing the home as Simmons's residence. For example, Simmons had provided the home's address to federal probation services as part of his then-ongoing probation. So it was apparent to Stoddard that Simmons was residing at the Weatherwood home. These months of investigation culminated in December 2022—within seven days of the last controlled buy between the informant and Simmons—when Stoddard sought a search warrant for the Weatherwood home.

Stoddard outlined all this information in the warrant affidavit. And once granted, the warrant included the Weatherwood home and several vehicles parked there. Officers could search for both drugs and "[a]ny and all records . . . which would indicate the trafficking of controlled substances," including records of cash transactions, paperwork showing money owed, and receipts for storage facilities.

Stoddard's affidavit did not only rely on the investigation to support the search of the Weatherwood home, but also on Stoddard's nineteen years in law enforcement and seven years investigating drug trafficking. In the affidavit, he outlined two types of traffickers: user-type and profit-type. User-type traffickers tend to deal in small amounts that support their drug habit. While profit-type traffickers deal in larger quantities, keep a base of operations, work through a network of suppliers, and generate paper trails to keep records of ongoing transactions—they run a business. So as the name implies, these traffickers are motivated by financial gain. Stoddard's experience suggests these traffickers are also likely to keep records in various places. Based on the complexity of their operations, records can be kept in secret locations in the home, cars, or safe houses. And based on the months of investigation, Stoddard concluded Simmons was a profit-type trafficker.

At the same time, Stoddard also sought a search warrant for the Holly Street house. The affidavit for this warrant provided more details about Simmons's drug trafficking. Surveillance

from the controlled buys captured Simmons counting "a wad of money" before entering the Holly Street home. He was also seen going from Holly Street to parking lots, briefly meeting with people, and then going back to the home—a pattern consistent with selling drugs. The affidavit also explained that because Simmons was on probation for possession with the intent to distribute cocaine, his personal residence was subject to warrantless searches. So Stoddard believed he was using the Holly Street home to avoid detection by law enforcement. This affidavit again categorized Simmons as a profit-type trafficker.

A judge issued both warrants on December 8, 2022, and law enforcement searched both homes that day. At the Weatherwood home, law enforcement found two handguns, ammunition, $600 in cash, five ounces of marijuana, and a bulk money counter. They also found roughly $1,600 in cash on Simmons's person and three cellphones in one of his cars. At the Holly Street home, law enforcement found fentanyl, cocaine, cocaine base, hydrocodone, marijuana, a fake ID, ammunition, and several handguns. A federal grand jury then charged Simmons with five counts: two counts of conspiracy to distribute and possess with intent to distribute controlled substances, one count of possession with intent to distribute cocaine, and two counts of being a felon in possession of firearms.[1]

Simmons moved to suppress all evidence derived from the search of the Weatherwood home. He argued the warrant lacked probable cause because it did not show a nexus between the Weatherwood home and any alleged drug activity. After a hearing, the district court denied the motion. The court based its decision on a long line of cases finding probable cause to search a dealer's home when the dealer "was engaged in continual and ongoing operations typically involving large amounts of drugs." R.85, Hr'g Tr., pp.183–87, PageID 558–62 (quoting *United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021)). The court also noted that the affidavit was strengthened by Stoddard's eight-month long investigation involving multiple controlled buys and Stoddard's conclusions that Simmons was a profit-type trafficker. And even though Simmons was on supervised release and maintained a stash house, it "wouldn't ameliorate the idea that other information or evidence of the crime would still be contained at his residence."

---

[1]Simmons's then-girlfriend was also charged with the first three counts in the same indictment, but she is not a party to this appeal.

*Id.* at p.187, PageID 562. In the alternative, the court found that if the warrant lacked probable cause, it could be saved by the good-faith exception to the probable-cause requirement.

Simmons entered a plea agreement. He pleaded guilty to one count of conspiracy to distribute and possess with the intent to distribute controlled substances. But reserved his right to appeal the district court's adverse ruling on his motion to suppress. The district court sentenced him to 144 months' imprisonment followed by five years of supervised release. Simmons timely appealed.

**II.**

We apply a "mixed standard of review" when reviewing a motion to suppress. *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024). We review the district court's factual findings for clear error and legal conclusions de novo. *Id.*

The defendant faces two additional hurdles when we review the denial of a motion to suppress. First, "we consider the evidence in the light most favorable to the government." *Id.* (quoting *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013)). Second, our review of the probable cause determination is the second level of review. So we are deferential to probable cause determinations below; recognizing that they "take[] place on the front lines." *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc). The district court reviews the sufficiency of the warrant at a motion to suppress, and the district judge gives "great deference" to the initial determination that probable cause was present. *Id.* (quoting *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc)). The key question before the district court "is whether the issuing judge had a 'substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (cleaned up)). So on appeal, "we are mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant." *Id.* And it is "[w]ith great deference toward the issuing judge's determination, [that] federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021).

Simmons maintains that the warrant authorizing a search of his Weatherwood home was constitutionally deficient because it was not supported by probable cause that a search of the residence would reveal contraband or other evidence of criminal activity. Essentially, he argues that the government failed to show a nexus between the home and any alleged wrongdoing or possible evidence. We disagree.

Under the Fourth Amendment "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In modern parlance, the Fourth Amendment requires a search warrant to put forth a "substantial basis linking the evidence to be seized and the place to be searched." *United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). So there must be a "nexus between the place to be searched and the evidence to be sought." *Carpenter*, 360 F.3d at 594 (internal quotation marks omitted).

But a warrant to search a drug dealer's home lies at the center of two "competing concerns." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). On one side, though there may be probable cause to arrest, that does not "necessarily establish" probable cause to search that same suspect's home. *Id.* On the other side, "probable cause is a practical and common-sensical standard" and common sense suggests that when an individual is a suspect of a crime, his home will "often" be a "likely place" for him to keep the means, fruits, and evidence of his crime. *Id.* (internal quotation marks omitted). But we have clarified this tension, particularly as it relates to drug traffickers. Even if no direct evidence ties drug dealing to a home, a nexus exists based on circumstantial evidence "if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *Id.* at 448 (quoting *United States v. Feagan*, 472 F. App'x 382, 392 (6th Cir. 2012)); *see United States v. Gunter*, 551 F.3d 472, 481–82 (6th Cir. 2009); *McCoy*, 905 F.3d at 417–18.

This is the "continual-and-ongoing-operations theory." *McCoy*, 905 F.3d at 418. Under that theory, when a drug dealer's activity is regular and ongoing, it is more likely that his home will have evidence of that activity—supply, records, or monetary profits. *Gunter*, 551 F.3d at 481 (finding probable cause "[b]ecause the quantity of drugs and the repeated nature of the

transactions make it reasonable to conclude that Gunter was engaged in ongoing drug trafficking, it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence"). And in drug cases, we have regularly upheld findings of probable cause under this likelihood "even when there is absolutely no indication of any wrongdoing occurring at that residence." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (internal quotation marks omitted); *United States v. Goward*, 188 F. App'x 355, 359–60 (6th Cir. 2006) (per curiam) ("[I]n both his affidavit and at the motion to exclude hearing, [the affiant] stated that in his years of experience and training that drug dealers kept narcotics, paraphernalia, and weapons at their residence. Accordingly, drug trafficking, which the affiant witnessed and is further substantiated from his experience and training, establishes a sufficient nexus to support a finding of probable cause to search the place where the drug trafficker presently lives." (citations omitted)); *see also United States v. Jones*, 159 F.3d 969, 974–75 (6th Cir. 1998) (same).

Still a dealer's status *alone* is not enough to meet this standard. *Reed*, 993 F.3d at 449. To support an allegation of ongoing drug dealing, the warrant affidavit must detail "recent, reliable evidence of drug activity" and the place to be searched should be the dealer's current residence. *McCoy*, 905 F.3d at 418. One indicator of a dealer's drug activity is the quantity of drugs he traffics. *Gunter*, 551 F.3d at 481. But that is not the only indicator. An affidavit can also show ongoing drug activity through the "repeated nature of the transactions," *id.*, "a defendant's record of past drug convictions," *Sumlin*, 956 F.3d at 886 (internal quotation marks omitted), "independent surveillance," *Jones*, 159 F.3d at 974–75, "work with an international drug-trafficking operation," *Sheckles*, 996 F.3d at 342, or witness accounts corroborated by an affiant's "experience and training," *Goward*, 188 F. App'x at 359–60. Ultimately, probable cause is a fact-intensive inquiry that, "at its core, depends on the totality of the circumstances," so there is no single factor that predominates. *Sanders*, 106 F.4th 461 (internal quotation marks omitted). But we have said that if the affiant cannot confirm the dealer lives at the home or if the drug activity is not recent, the warrant is likely deficient. *Id.* at 466.

*Sanders* recently reiterated that "probable cause to search a known drug dealer's residence is established where the dealer is engaged in continual and ongoing operations." *Id.* (internal quotation marks omitted). Sanders did not live at the relevant apartment, so the case

was not resolved on a continual-and-ongoing-operations theory. *Id.* But after affirming the principle, we nonetheless found probable cause to search the apartment based on a series of controlled buys with a reliable informant. *Id.* at 463. Law enforcement watched Sanders leave the apartment, get into a car, drive to the buy location, briefly meet with the informant, then return to his car, and return to the apartment. *Id.* "This evidence alone [c]ould end the matter," but the court then noted that "the search warrant sought not just drugs, but also the proceeds of drug trafficking." *Id.* And it would be "fair for officers to assume" that Sanders took proceeds into the apartment. *Id.* So even if Sanders did not live in the apartment, its connection to his dealing provided a sufficient nexus to establish probable cause. *Id.*

A separate question relates to whether information from a confidential informant provides sufficient reliability to show probable cause. There is no formula or rote recitation of credentials that makes an informant credible. *See id.* at 464. After all, "we assess what the affidavit said about the informant's tip, not what it did not." *Id.* Still, an informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230 (internal quotation marks omitted). To that end, we have found credible an informant who was known to law enforcement and saw illegal activity firsthand. *United States v. Dyer*, 580 F.3d 386, 391–92 (6th Cir. 2009). And as it relates to a nexus finding in cases like this one, we have upheld a warrant for a drug dealer's home based on "a proven informant who conducted multiple controlled buys along with evidence that [the defendant] drove from his home to the location of the drug sale." *United States v. Coleman*, 923 F.3d 450, 458 (6th Cir. 2019).

With this context in mind, to the issue here: did the warrant affidavit provide a "substantial basis" for the magistrate to find probable cause that Simmons's Weatherwood home had a nexus to his drug activity. *McCoy*, 905 F.3d at 415. It did.

Start first with the evidence provided by the confidential informant. He was highly credible. The Grand Rapids Vice Unit knew the informant for over a year and had tested his credibility with three successful "reliability buys." Since then, the informant had provided the Vice Unit with information on several drug traffickers and law enforcement had consistently verified the information. The informant was also credible when it came to Simmons specifically.

Officer Stoddard, the affiant, met with the informant several times over an eight-month period to discuss Simmons's drug operation. The informant identified Simmons by his photo, claimed to know him for over a year, and provided Stoddard with the phone number Simmons used for drug dealing. The informant also conducted multiple controlled buys from Simmons, which all tested positive for cocaine.

So the informant was both known to law enforcement and a witness to Simmons's illegal activity—exactly what credibility requires. *Dyer*, 580 F.3d at 391–92. And through this informant, the affidavit presents "recent, reliable evidence of drug activity," including a controlled buy that occurred seven days before the affidavit was issued. *See McCoy*, 905 F.3d at 418; *see also Coleman*, 923 F.3d at 458.[2]

Stoddard also confirmed that the Weatherwood home is Simmons's residence based on his own surveillance, making this case fit neatly under the continual-and-ongoing-operations theory. *Sanders*, 106 F.4th at 466. Stoddard spent hours surveilling the home and regularly observed Simmons there. But even better, we know it was his residence because Simmons told the government it was. He was on federal probation then and had listed the Weatherwood home as his home address. This is not like *Sanders* where the affidavit failed to show that the defendant lived in the apartment, so we could not infer that evidence of his continual-and-ongoing drug operations would be there. *Id.* The affidavit shows that Simmons lived in the Weatherwood home and participated in recent, ongoing drug activity. That alone shows a nexus between the home and the crime. *Reed*, 993 F.3d at 448. This evidence can end the matter.

But Simmons protests. He claims the alleged-drug activity occurred elsewhere and there is nothing "specific and concrete" connecting his alleged crimes to the Weatherwood home. Appellant Br. at 25; Reply Br. at 6. But first, let's remember what the warrant sought: "[a]ny and all records . . . which would indicate the trafficking of controlled substances." And the

---

[2]While our review is limited to the "four corners" of the affidavit, *see Moore*, 999 F.3d at 996, the Holly Street affidavit provided a much more detailed account of Simmons's drug activity. While we find the Weatherwood affidavit was sufficient to establish probable cause, it is clear the affiant had additional details on Simmons's extensive drug trafficking enterprise. The Weatherwood affidavit would have been stronger if some of that information had been included in this affidavit. Though these omissions do not make the warrant constitutionally infirm, when applying for a warrant to search, more is more.

affidavit distinguished between user-type traffickers who deal in small quantities and profit-type traffickers who deal for financial gain. Although the affidavit did not provide a specific quantity term for Simmons's drug sales, Stoddard named Simmons as a profit-type trafficker based on Simmons's pattern of activity, including repeated transactions with a reliable informant and his use of a stash house.

As explained, under the continual-and-ongoing-operations theory, a dealer of this type often keeps evidence of his crimes in the home, such as records and profits. *Gunter*, 551 F.3d at 481; *see also Sumlin*, 956 F.3d at 887 (finding probable cause based on affiant's "personal experience and training that drug dealers . . . routinely keep drug-related items (i.e. records of their drug transactions, equipment, supplies, and weapons) at their residences"); *see also Goward*, 188 F. App'x at 359–60 (same); *Jones*, 159 F.3d at 974 (same). And probable cause is a commonsense inquiry. *Reed*, 993 F.3d at 447. As the district court noted, just because Simmons had a stash house does not "ameliorate the idea that other information or evidence of the crime would still be contained at his [Weatherwood] residence." R.85, Hr'g Tr., p.187, PageID 562. So based on the informant's controlled buys and Stoddard's assessment of Simmons based on those buys, the issuing judge had a substantial basis for concluding that a search of the Weatherwood home would uncover evidence of wrongdoing.

Even more, police observed controlled buys between Simmons and the informant. Simmons would conduct the buy, continue to another home (identified as his stash house), then leave that home, and return to his Weatherwood residence. This predictable pattern of activity led Stoddard to believe Simmons "maintain[ed] a base of operation" at the stash house but likely "generate[d] the expected paper trails" that could be found in a range of areas including "secret locations within the home[]."**[3]**

---

**[3]**Simmons repeatedly alleges the affidavit is improper because it relies only on "standard, generic boilerplate" language used "in virtually all search-warrant affidavits for homes." Appellant Br. at 19. This argument has two flaws. First, Simmons provides no basis for his conclusion that this evidence is used in all affidavits. And second, we have made clear that "the fact that a search-warrant affidavit is an almost 'word-for-word' copy of the affidavit in a prior case is irrelevant '[a]s long as there is sufficient information to provide probable cause for the search.'" *United States v. Green*, 572 F. App'x 438, 441 (6th Cir. 2014) (alteration in original) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). The question is whether, based on "the totality of the circumstances, the low bar of probable cause has been overcome." *Moore*, 999 F.3d at 996. And here, Stoddard's investigation, observations, and the informant's credible evidence combined with the common-

Finally, Simmons argues that our caselaw post-*Sanders* makes it harder to show a nexus based on circumstantial evidence because the "nexus must be specific and concrete" to allow an inference that a place can be searched. Reply Br. at 6 (quoting *United States v. Burrell*, 114 F.4th 537 (6th Cir. 2024)). So "*Sanders* does not 'throw open the door' to residential searches based only on alleged drug-dealer status." *Id.* at 5 (quoting *United States v. Neal*, 106 F.4th 568, 573 (6th Cir. 2024) (per curiam)). As mentioned earlier, Simmons is correct that drug-dealer status alone is insufficient. But recent and reliable evidence of ongoing drug activity provides something beyond drug-dealer status to allow an officer to draw the concrete and specific inference that evidence exists in the home—a point we reemphasized in *Burrell*. 114 F.4th at 551 ("[T]his court recently recognized 'the inference that "in the case of drug dealers, evidence is likely to be found where the dealers live."'" (quoting *Sanders*, 106 F.4th at 465)).[4] And we have reiterated this point in other cases post-*Sanders*. *See Neal*, 106 F.4th at 573 ("As our en banc Court recently recognized, confirmation of those two facts, known drug dealer status and the dealer's residence, in some instances, can provide circumstantial evidence establishing probable cause to search the residence for drug trafficking evidence." (citing *Sanders*, 106 F.4th at 464)); *see also United States v. Allen*, No. 23-6054, 2024 WL 4929726, at *3 (6th Cir. Dec. 2, 2024) ("As recently noted by this court, sitting en banc, when an affidavit establishes both where the defendant lives and the defendant's active engagement in a criminal activity, an officer may allege, based on his experience, that it is likely that the 'criminal suspect keeps the

---

sense reality that ongoing drug dealers keep evidence in the home passes the low bar that probable cause requires. *Reed*, 993 F.3d at 449.

[4]Simmons also highlights that, in *Burrell*, the court had evidence that the defendant was known to have drug-manufacturing equipment and participated in narcotics processing at his home. But this information was only relevant to the court's discussion of Burrell's non-residential homes. *Burrell*, 114 F.4th at 552–53 ("Burrell had transported drug-manufacturing equipment to Fairmont Street and worked to process narcotics at the residence as well. . . . [B]ut there is no evidence that Burrell ever lived at Fairmont Street."). As for the home he was living in (his mother's home), the police had searched Burrell's three other homes and found drugs. *Id.* at 553. So that "raised the inference" that another home of Burrell's would have other evidence of drug trafficking. *Id.* (citing *Sanders*, 106 F.4th at 462). This reasonable inference, coupled with the affiant's sworn statement that drug traffickers often store drugs at their family members' homes, established sufficient probable cause. *Id.*

Here too, the affiant provided a sworn statement that profit traffickers often store evidence of drug trafficking in the home. And although police had not yet searched the Holly Street house, they conducted several controlled buys that confirmed Simmons's drug activity. So *Burrell* supports the point that this evidence "raised the inference" that Simmons's Weatherwood home would contain evidence of drug trafficking.

instrumentalities and fruits of his crime in his residence,' and that allegation may be sufficient, in context, to create probable cause." (quoting *Sanders*, 106 F.4th at 462)).

In *Neal*, probable cause was not at issue, so we decided the case under the good-faith exception to the probable-cause requirement. 106 F.4th at 573. But our discussion of *Sanders* and the continual-and-ongoing-operations theory counters Simmons's reading of these cases. *Id.* The court reiterated that an affidavit sufficiently links the items sought to the place to be searched when it is based on "a trustworthy confidential informant and buttressed by a recent controlled buy" and the police have evidence that the place is the dealer's home. *Id.* We again explained that "decades of police work, not to mention common sense, has shown that drug dealers, by the nature of their work, often secure evidence of their crimes in their homes, creating a fair probability that evidence will be found there." *Id.*

Under *Neal*'s discussion of the continual-and-ongoing-operations theory, the affidavit here was sufficient to demonstrate probable cause. Evidence from a confidential informant was buttressed by recent controlled buys and evidence that the Weatherwood home was Simmons's regular residence. And Stoddard based his inference that the Weatherwood home contained evidence of drug trafficking on his nineteen years in law enforcement, and seven years specifically focused on drug-trafficking investigations. True, many cases in this court have avoided the probable-cause question by resolving cases under the good-faith exception. *See Neal*, 106 F.4th at 571; *see also United States v. Harrison*, No. 24-5180, 2024 WL 4950166, at *2 (6th Cir. Dec. 3, 2024) (resolving on good faith grounds); *United States v. Turner*, No. 22-5046, 2024 WL 3634454, at *8 (6th Cir. Aug. 2, 2024) (same). But we need not take that road. Our precedents before and after *Sanders* make clear that the affidavit had sufficient information to provide probable cause to search the Weatherwood home.

Because the district court did not err in denying Simmons's motion to suppress, we AFFIRM.

_____

**CONCURRENCE**

_____

RITZ, Circuit Judge, concurring in the judgment.  I agree with the majority that we should affirm the denial of Simmons's motion to suppress.  But I would resolve this case under the good-faith exception.

The good-faith exception applies when "a reasonably well trained officer" would have no reason to believe that a magistrate-approved search was illegal.  *United States v. Leon*, 468 U.S. 897, 922-23, 922 n.23 (1984); *see also Davis v. United States*, 564 U.S. 229, 238 (2011).  Simmons argues that the officers in this case could not have relied in good faith on the Weatherwood warrant because the warrant was "bare bones."  That argument fails.

A warrant is bare bones when it is "so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable."  *United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006).  We recently explained in *United States v. Sanders* that bare bones affidavits "nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied."  106 F.4th 455, 468 (6th Cir. 2024) (en banc).

Here, the warrant affidavit plainly went beyond naked assumptions or boilerplate language.  To be sure, the affidavit said nothing about the amount of drugs being trafficked by Simmons and did not identify any drug-trafficking activity at Simmons's Weatherwood residence.  But the affidavit described a reliable informant's drug-dealing activities with Simmons, Simmons's participation in multiple drug transactions (including within seven days of the warrant's issuance), and the officer's experience investigating profit-trafficking drug dealers.  Based on these facts, the affidavit concluded that there may be records or proceeds of drug trafficking inside Simmons's Weatherwood home.

Whether or not these facts constituted probable cause, they established a "minimally sufficient nexus" with the residence.  *United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) (en banc) (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016)).  Cases where we have declined to apply the good-faith exception involved much more faulty warrants.

*See, e.g.*, *United States v. Ward*, 967 F.3d 550, 555-56 (6th Cir. 2020) (affidavit relied on a single trash pull, the defendant's prior charges, and bare allegations of unidentified strangers at a residence); *McPhearson*, 469 F.3d at 526-27 (affidavit alleged only that defendant had crack cocaine in his pocket, not that he was a dealer).

Our precedent also counsels that when it is "debatable whether probable cause exists" in known-drug-dealer cases, the good-faith exception applies. *See United States v. Neal*, 106 F.4th 568, 573 (6th Cir. 2024) (per curiam). The probable-cause analysis in known-drug-dealer cases is "unsettled" in our circuit and naturally "fact-intensive." *United States v. Reed*, 993 F.3d 441, 452 (6th Cir. 2021) (citations omitted). Given this landscape, we should not "expect nonlawyer officers to know better than judges that their affidavits" may be faulty, "except in obvious cases." *Id.* Indeed, "[c]ase after case" finds good-faith reliance when officers reasonably infer that there is "a connection between evidence of drug trafficking and a drug dealer's home." *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018). Here, the officers could reasonably infer such a connection, so the good-faith exception applies, regardless whether probable cause existed.

For these reasons, I would affirm the denial of Simmons's motion to suppress under the good-faith exception.