NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0336n.06

Case No. 24-1465

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Jul 09, 2025

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| KENDALL HOLLINS, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Kendall Hollins appeals the district court's denial of his motion to suppress evidence and challenges the procedural reasonableness of his sentence. We affirm.

**I.**

Kendall Hollins has been on the radar of Michigan's Southwest Enforcement Team ("SWET"), a multi-jurisdictional narcotics unit, for many years. At all relevant times, Det. Jeremiah Gauthier has worked with SWET. While working undercover with SWET in 2015, Det. Gauthier bought a few grams of cocaine from Hollins—a purchase that ultimately led to a state drug-possession conviction for Hollins. Then in late 2016, Hollins became the subject of another SWET investigation. This time, officers observed Hollins leave a suspected drug dealer's residence, so they initiated a traffic stop, searched his vehicle, and found cocaine, fentanyl, and heroin. That led to another state drug-trafficking conviction.

About four years later, Det. Gauthier renewed his investigation into Hollins. He arranged a controlled buy, observed an apparent drug transaction, and tried to make a connection between Hollins's drug-trafficking activities and his residence in Benton Harbor, Michigan. Det. Gauthier also tried to connect Hollins's drug-trafficking activities to two storage units—units 455 and 456—that Hollins rented at a local storage facility. The investigation dried up for two years, only to restart in March 2023.

Shortly after the investigation restarted, Det. Gauthier sought two search warrants—one to search Hollins's house and another to search the storage units. Both warrants authorized the seizure of the same types of contraband. Det. Gauthier submitted affidavits in support of each of the search warrants. The affidavits are identical apart from a single paragraph in each affidavit—Paragraph UU. Paragraph UU of the affidavit in support of the search warrant for Hollins's house included information suggesting that drug dealers keep drugs at home. R. 25-3, PageID 78. The same paragraph of the other affidavit detailed how drug dealers often store drugs in "other structure[s]" that "they frequent or have access to." R. 25-4, PageID 95.

The affidavits explained that Det. Gauthier believed Hollins stored drugs, firearms, and money at the house and the storage units. The affidavits described controlled buys involving Hollins. They also detailed Hollins's frequent, brief visits to the storage units along with positive canine alerts for drugs at those units. The affidavits further recounted statements from confidential informants describing Hollins's extensive drug-trafficking history. Finally, the affidavits pointed out Hollins's prior controlled-substance convictions.

Based on the information contained in the affidavits, on March 22, 2023, a state-court judge issued search warrants for Hollins's house and the storage units. Officers executed the warrants and discovered an array of contraband. They found a digital scale with fentanyl residue and a

loaded pistol at the house; a rifle and a conversion kit to enhance a pistol in unit 455; and two digital scales, ammunition, a loaded pistol, and large quantities of methamphetamine and fentanyl in unit 456.

A federal grand jury indicted Hollins for possession of controlled substances with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and for two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Hollins moved to suppress the evidence found in his house and storage units. The district court denied Hollins's motion, concluding that the affidavit supporting the search warrant for the storage units established probable cause to search unit 456. And though it found the affidavits lacked probable cause to search unit 455 and the house, the court concluded that the good-faith exception to the exclusionary rule applied.

Hollins pleaded guilty to the drug charge, reserving his right to appeal the suppression decision. At sentencing, the district court found that Hollins maintained unit 456 to store drugs. So the district court applied the drug-premises enhancement under U.S.S.G § 2D1.1(b)(12). Ultimately, the district court sentenced Hollins to 108 months' imprisonment. This timely appeal followed.

## II.

Hollins raises two issues on appeal. He contends that the district court erred by: (1) denying his motion to suppress the evidence seized as a result of the search of his house and storage units, and (2) imposing a procedurally unreasonable sentence by applying the drug-premises enhancement, which increased Hollins's Sentencing Guidelines range.

**A.**

Hollins first challenges the district court's denial of his motion to suppress. This requires us to "apply a mixed standard of review," *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024), under which we assess "legal conclusions de novo" and "factual findings for clear error," *United States v. Simmons*, 129 F.4th 382, 386 (6th Cir. 2025) (citation omitted). When, as here, a district court has denied a defendant's motion to suppress, "we review all evidence in the light most favorable to the government." *United States v. Peake-Wright*, 126 F.4th 432, 436 (6th Cir. 2025) (quotation omitted). "We can affirm the denial of a motion to suppress on any grounds supported by the record." *United States v. Whitley*, 34 F.4th 522, 535 (6th Cir. 2022).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also requires officers to have probable cause to obtain a warrant to search a house or a storage unit. *United States v. Laughton*, 409 F.3d 744, 746–47 (6th Cir. 2005) (house); *United States v. Gregory*, 311 F. App'x 848, 857–58 (6th Cir. 2009) (storage unit). "[P]robable cause is a reasonable ground for belief of guilt" that "must be particularized with respect to the [place] to be searched." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation and citation omitted). To establish probable cause, a search-warrant affidavit must show "a nexus between the place to be searched and the evidence sought." *United States v. Burrell*, 114 F.4th 537, 551 (6th Cir. 2024) (quotation omitted).

The exclusionary rule prohibits the government from using evidence at trial obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 231–32 (2011). But even if an affidavit fails to establish probable cause, courts need not suppress evidence from the search if the good-faith exception to the exclusionary rule applies. *United States v. Sanders*, 106

F.4th 455, 467–68 (6th Cir. 2024) (en banc). The good-faith exception applies if officers acted "in 'objectively reasonable reliance' on a warrant later deemed to be invalid." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (per curiam) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).

That said, officers cannot obtain evidence through "deliberate, reckless, or grossly negligent conduct." *Sanders*, 106 F.4th at 467 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). Indeed, the good-faith exception does not apply if an officer relies on a search-warrant "affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (citation modified). We refer to these deficient affidavits as "bare bones" affidavits. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017).

An affidavit is "bare bones" if it "nakedly assume[s] or vaguely conclude[s], without attempting to demonstrate why, probable cause has been satisfied." *Sanders*, 106 F.4th at 468. For example, we have found affidavits to be "bare bones" where they: (1) "provid[ed] nothing more than a mere guess that contraband or evidence of a crime would be found"; (2) were "completely devoid of facts" supporting probable cause; or (3) were "so vague as to be conclusory or meaningless." *White*, 874 F.3d at 496 (citation modified).

Importantly, a bare-bones affidavit is not one that simply lacks probable cause—instead, a bare-bones affidavit "must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *Id.* at 497 (citation omitted). Accordingly, where an affidavit provides even "a modicum of evidence, however slight, showing *some* connection, regardless of how remote it may have been between the criminal activity at issue and location of the search, there exists a minimally sufficient nexus necessitating application of the good faith rule." *Sanders*, 106 F.4th at 469 (citation modified). And in assessing an affidavit,

we read it using our common sense, and we do "not engage in . . . line-by-line scrutiny." *See United States v. Whiteside*, __ F.4th __, 2025 WL 1431109, at \*5–6 (6th Cir. May 19, 2025) (citation modified).

Hollins argues that the affidavits supporting the search warrants were "bare bones," so the good-faith exception does not apply.[1]  We disagree.  Because the affidavits detailed how Det. Gauthier's training and experience buttressed his conclusions, *see Sanders*, 106 F.4th at 461–62, and provided several facts supporting a minimally sufficient nexus connecting drug-trafficking activity with Hollins's house and the storage units, the district court did not err in denying Hollins's motion to suppress.

**1.**

*The House.*  Hollins does not dispute that he resided at the house that was the subject of the search warrant.  The search-warrant affidavit for the house established a connection between Hollins's drug-trafficking and his house in several ways.

First, the affidavit detailed two controlled purchases.  In February 2021, Det. Gauthier arranged for a confidential informant to buy methamphetamine from Hollins.  Det. Gauthier conducted surveillance during the buy.  The controlled purchase went forward as planned and, afterward, Det. Gauthier followed Hollins back "to the area near" his house.  R. 25-3, PageID 71.  Then in March 2023, Det. Gauthier arranged another controlled buy.  This time, law enforcement saw Hollins leave his house in a white SUV to complete the transaction and, five days later, the informant saw the white SUV parked at Hollins's house.  This activity supports a connection

---

[1] Hollins also argues that good-faith exception does not apply because "the warrant was so facially deficient that the officers could not reasonably presume it to be valid." *United States v. O'Neill*, 94 F.4th 531, 538 (6th Cir. 2024) (citation modified).  That said, his argument focuses on the affidavits, so it appears "that he conflated the *warrant*[*s*] with the *supporting affidavit*[*s*] . . . [as] [t]he facially deficient exception pertains to the former, not the latter." *White*, 874 F.3d at 496 n.1 (citation modified).

between Hollins's drug-dealing activity and his house, as a defendant's "stop" at his residence "immediately before or after a drug transaction" suggests that "evidence of drug sales might be found" there. *See United States v. White*, 990 F.3d 488, 492 (6th Cir. 2021); *see also Sanders*, 106 F.4th at 462.

Second, the affidavit noted Hollins's extensive drug-trafficking activities. Although not dispositive, we "have blessed the inference that in the case of drug dealers, evidence is likely to be found where the dealers live." *Sanders*, 106 F.4th at 465 (citation modified).

Third, the affidavit included Hollins's prior drug convictions and statements from confidential informants suggesting that Hollins was a "big time" dealer. R. 25-3, PageID 75. These facts, combined with the controlled purchases, reasonably suggested that law enforcement would find contraband at Hollins's residence. *See Simmons*, 129 F.4th at 387.

All in all, these considerations supported the conclusion—drawn from Det. Gauthier's years of narcotics enforcement—that Hollins used his residence for drug-trafficking purposes. *See United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc).

**2.**

*The Storage Units.* Hollins's connection to the storage units is by no means incidental— he rented them for years. And as the affidavit described, those storage units were linked to Hollins's drug-trafficking activity.

In the fifteen days before Det. Gauthier's warrant application in 2023, Hollins's pin code— which permitted access to the storage units—was used frequently to open unit 456 for brief periods. And though not visited as often, Hollins's code was also used to access unit 455 for even shorter durations. Moreover, when law enforcement had surveilled Hollins in March 2021, they observed similarly fleeting visits to the storage units. "The frequency and duration of these short stays

pointed to drug-trafficking activity." *United States v. Briggs*, No. 23-1963, 2024 WL 5135701, at *2 (6th Cir. Dec. 17, 2024).

In March 2021, Det. Gauthier observed Hollins enter unit 456 for a brief period and then leave in his vehicle to meet with an unknown person. This unfamiliar individual walked up to Hollins's front passenger door, and they interacted for a few minutes before leaving the area in their own vehicles. Det. Gauthier explained, based on his training and experience, that such short contact followed by a hasty departure is indicative of drug trafficking.

Similarly, in March 2023, Det. Gauthier reviewed surveillance footage from the storage facility and observed a white SUV—the same type of vehicle spotted at a recent controlled buy— enter the facility immediately after Hollins's pin code was used. While the white SUV was at the facility, someone entered the same pin code to access unit 456.

Additionally, certified canines alerted to the presence of drugs at the storage units on two separate occasions. *See United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). In March 2021, a canine detected drugs at both units. And in March 2023, a different canine alerted at unit 456.

This activity reinforced Det. Gauthier's belief that Hollins used the storage units as "trap houses," i.e., places to store drugs for "quick and easy access." R. 25-4, PageID 95; *see United States v. Acosta-Barrera*, 819 F. App'x 366, 372 (6th Cir. 2020) (emphasizing "the officer's conclusion based on his training and experience that the residence is likely a stash house" when applying the good-faith exception).

\*     \*     \*

Based on the information contained in the search-warrant affidavits as highlighted above, "a reasonably well-trained officer in the circumstances presented here would not know to disregard

[the] judicial determination that probable cause existed" to search Hollins's house and the storage units. *United States v. Gilbert*, 952 F.3d 759, 760–61 (6th Cir. 2020). Because the good-faith exception applies, we need not decide whether the affidavits established probable cause to search Hollins's house and storage units. *See Simmons*, 129 F.4th at 391 (collecting cases).

**3.**

Resisting this conclusion, Hollins argues that the information in the affidavits was too stale for officers to rely on it in good faith. To be sure, staleness can defeat probable cause, especially where an officer expects to find drugs at a particular location. *See United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) ("In the context of drug crimes, information goes stale very quickly because drugs are usually sold and consumed in a prompt fashion." (citation modified)). But even if some of the information in the affidavits was stale, that does not mean that the officers executing the search warrants acted in bad faith. *See United States v. Rugh*, 968 F.2d 750, 752 (8th Cir. 1992); *see also United States v. Qose*, 679 F. App'x 761, 763 (11th Cir. 2017) (per curiam).

Otherwise stale information may be refreshed if accompanied by more recent corroborating evidence. *United States v. Spikes*, 158 F.3d 913, 924 (6th Cir. 1998). If we view the information in the affidavits about Hollins's drug-trafficking activity in and before 2021 in isolation, then it may well be stale given that Det. Gauthier submitted the affidavits in March 2023. But the affidavits had newer information too—a controlled purchase and canine alert in that same month.

Further, the affidavits explained that three confidential informants told Det. Gauthier in March 2023 that Hollins had been trafficking large quantities of methamphetamine over the prior five years. *See United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (holding that evidence of "continuous and ongoing" narcotics trafficking undermines a staleness claim). And these informants, according to the search-warrant affidavits, had worked with SWET to conduct

controlled buys and had not provided false or misleading information. *See United States v. Brown*, 732 F.3d 569, 574 (6th Cir. 2013) ("[O]ur precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." (citation modified)).

Finally, the affidavits did not focus solely on drugs. Det. Gauthier also sought firearms, which we have long considered to be "tools of the drug-trafficking trade." *United States v. Cleveland*, 907 F.3d 423, 436 (6th Cir. 2018) (quotation omitted). So the fact that the warrant targeted not just drugs, but also "physical evidence of drug activity, including firearms," mitigates the staleness of older information. *See United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015). This is because firearms "are durable goods and might well be expected to remain in a criminal's possession for a long period of time." *Id.* (quotation omitted). Based on these considerations, the executing officers did not unreasonably "rely on the state judge's conclusion that probable cause existed to search" the house and the storage units. *See United States v. Reed*, 993 F.3d 441, 450–51 (6th Cir. 2021).

**B.**

Hollins next argues that his sentence was procedurally unreasonable. A district court procedurally errs by, among other reasons, "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Hollins contends that the district court improperly calculated his Guidelines range when it applied the drug-premises enhancement. The court applied that enhancement after finding that Hollins "maintained" unit 456 "for the purpose of manufacturing or distributing a controlled

substance." *See* U.S.S.G. § 2D1.1(b)(12). "[W]e review the factual determinations underpinning the application of [the drug-premises] enhancement for clear error," but "review legal interpretations of the relevant legal texts de novo." *United States v. Tripplet*, 112 F.4th 428, 432 (6th Cir. 2024) (citations omitted).

The drug-premises "enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). Hollins disputes only the third element, claiming that he maintained unit 456 primarily to store and retrieve clothing and personal items, and that any "drug storage there was incidental." D. 20 at p.36.

Narcotics storage alone can satisfy the "purpose" element of the drug-premises enhancement. *United States v. Taylor*, 85 F.4th 386, 389 (6th Cir. 2023). "[D]rug operations do not need to be the 'sole purpose' of the premises." *Tripplet*, 112 F.4th at 432. Therefore, accepting Hollins's argument that he used unit 456 principally as "a walk-in closet," D. 20 at p.36, does not preclude the possibility that another primary purpose of the unit was to store drugs. So does the evidence here establish such a conclusion? We believe that it does.

The district court found that "the amount of drugs" and "the frequency of appearance at [unit 456] . . . combined to make it pretty clear that the storage of drugs was a principal use of the premises." R. 67, PageID 362. The drug weight at issue—approximately 90 grams of fentanyl and 211 grams of methamphetamine—indicates a quantity beyond personal use. *See United States v. Uminn*, 820 F. App'x 353, 357 (6th Cir. 2020). Although this amount may not suggest large-scale drug trafficking, "the guideline encompass[es] small-scale as well as large-scale drug-distribution activities." *United States v. Terry*, 83 F.4th 1039, 1044 (6th Cir. 2023).

Furthermore, the district court did not err in considering how often unit 456 was accessed. In the fifteen days preceding the warrant, unit 456 was accessed thirteen times, with each visit lasting about five to ten minutes. True, law enforcement never observed Hollins enter the unit in 2023, but that does not matter because Hollins stipulated that he "was the only person who controlled what was inside the unit" and that he "left . . . drugs in unit #456 because he planned to return later, retrieve the drugs, and sell them to other people for money." R. 35, PageID 137.

Ultimately, "the evidentiary bar for applying the [drug-premises] enhancement is a relatively low one," and here, the government met its burden. *See Terry*, 83 F.4th at 1044 (citation modified).

### III.

For these reasons, we **AFFIRM** the district court's judgment.