NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0002n.06

Case No. 25-1248

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 02, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| ORLANDO BERNARD EASTER, | ) | |
|     Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; BOGGS and BLOOMEKATZ, Circuit Judges.

SUTTON, Chief Judge. While investigating Orlando Easter for drug trafficking, law enforcement successfully arranged at least three controlled buys between Easter and a confidential informant. Based on the controlled buys and other evidence, police obtained warrants to search Easter's storage unit and his girlfriend's home. The searches uncovered a large cache of drugs and guns. Easter moved to suppress the evidence, arguing that the police lacked probable cause to conduct the searches. The district court disagreed. We affirm.

I.

In January 2024, police began investigating Easter for heroin and fentanyl trafficking. With the help of a confidential informant, police coordinated several controlled buys of narcotics from Easter. During the lead-up to one of these transactions, police observed Easter drive his gold Chevrolet Impala from his girlfriend's house (where Easter appeared to live with her and their

children) to an open-air self-storage facility. Easter typed a code into a keypad and entered the facility. A short time later, Easter exited and met with the confidential informant to complete the drug deal.

As the investigation continued, this sequence became a pattern. Time after time, police watched Easter enter the storage facility, spend a few minutes inside, and proceed immediately to the arranged location for a controlled buy. The manager of the storage facility told investigators that the code Easter used to enter the facility belonged to the renter of Unit H17. According to the facility's customer records, the individual who rented Unit H17 was a man named "Paul Johnson." R.69 at 6. Paul Johnson's email address happened to be Oeaster20002@gmail.com.

Police increased their surveillance of Easter. To that end, they secured two search warrants. The first warrant allowed them to attach a GPS device to Easter's gold Impala. The second one permitted them to set up a camera pointed at the exterior of Unit H17. Police supported both warrants with affidavits detailing the role the car and storage unit played in the controlled buys.

The increased surveillance paid dividends. Police learned that Easter visited his storage unit frequently, often many times a day, and that each visit lasted a few minutes. During one of these visits, the camera captured Easter as he unloaded an item from his vehicle and brought it into the storage unit. On other occasions, he would enter the unit empty-handed but emerge with a package. At one point, the camera recorded a scene that might have appeared in *Breaking Bad*: Easter wearing a white N95 mask over his face as he tied up a baggie filled with white powder. Easter slipped the baggie into his car's center console.

With this evidence in hand, police obtained two more warrants: one to search Easter's storage unit, the other to search his girlfriend's home. The supporting affidavits detailed how the investigation linked Easter to Unit H17 and described the evidence uncovered as police watched

him. The affidavits also detailed the nexus between Easter, his drug dealing, and his girlfriend's home. Police consistently observed Easter at that address before he drove to controlled buys, and even outside the context of the controlled buys, officers regularly observed the Impala at that address. A judge issued both warrants.

The searches turned up a lot more incriminating evidence. In Easter's storage unit and his girlfriend's house, the officers found large quantities of fentanyl, cocaine, heroin, MDMA, and methamphetamine. Police also seized eight guns (one with an obliterated serial number, two others reported stolen), several boxes of ammunition, and $139,800 in cash. On a dresser in Easter's bedroom, officers found the keys to Unit H17.

A federal grand jury charged Easter with possessing controlled substances with intent to distribute and possessing firearms as a felon. Easter moved to suppress the evidence obtained from the searches, claiming that all four warrants lacked probable cause. He also sought a *Franks* hearing, claiming the officers knowingly omitted material information from the affidavits. The district court denied Easter's motions. Easter conditionally pleaded guilty, reserving the right to appeal the suppression and *Franks* rulings. The court sentenced Easter to 12 years.

II.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "In deciding whether probable cause exists to issue a warrant, the magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. White*, 990 F.3d 488, 490 (6th Cir. 2021) (quotation omitted).

On appeal, Easter contends that investigators lacked probable cause for all four of the warrants obtained in this case. We address each warrant in turn.

*Impala GPS warrant.* Probable cause exists for a tracking-device warrant "if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime." *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019). The affidavit in this case established exactly that. Police explained that a reliable confidential informant engaged in "numerous controlled buys" of narcotics from Easter. R.48-2 at 4. Police observed that Easter drove the Impala to at least three of those controlled buys. The vehicle's registration listed Easter as the owner, and police observed the car parked in the driveway of Easter's girlfriend's home on "several occasions." R.48-2 at 4. "Courts have upheld vehicle-tracking warrants based on much weaker factual allegations than these." *Coleman*, 923 F.3d at 454 (collecting cases).

Easter responds that the controlled buy identified in the affidavit occurred three weeks before police sought the warrant, thus eliminating probable cause in the application because it turned on stale information. But the Fourth Amendment does not impose such a rigid shot clock in this setting. Even three-week-old surveillance can, and in this instance does, establish a "fair probability" that a search will turn up incriminating evidence. *White*, 990 F.3d at 490 (quotation omitted). The objective of this warrant was not to look for a stash of drugs at a site that no longer might contain them. It was to use GPS tracking to capture Easter's movements during *future* drug deals. To that end, the affidavits contained plenty of evidence that Easter engaged in ongoing drug deals. The prospective nature of the search thus counters any claim of staleness.

Easter next points out that the Impala was one of three cars to which he had access in early 2024. The mere chance that he would use the Impala in a future drug transaction, he explains,

does not suffice to establish probable cause. But that line of reasoning overstates the government's burden. Police need show only a *fair* probability that a search will unearth evidence of a crime. Given the Impala's role in several prior drug deals, the probability that Easter would use the car to sell drugs was indeed fair.

*Unit H17 video-surveillance warrant.* Easter challenges the video surveillance placed outside the storage unit, claiming that no probable cause supported the warrant. But the Fourth Amendment extends only to "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). A defendant thus may challenge a warrant on Fourth Amendment grounds only if he possesses "a property or a privacy interest" in the property searched. *United States v. Russell*, 26 F.4th 371, 377 (6th Cir. 2022). That means the search must involve a physical trespass on the defendant's own property, *see id.*, or an invasion of an area in which the defendant had a reasonable expectation of privacy, *United States v. Lanier*, 636 F.3d 228, 231 (6th Cir. 2011).

No trespass occurred. When "use of [a] . . . camera [does] not involve any sort of physical intrusion" into the defendant's property, no infringement of the defendant's property interest occurs. *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020). Because police never accessed Easter's storage unit, no trespass on his property took place.

No infringement on Easter's reasonable expectation of privacy occurred either. By pointing at the exterior of the storage unit, the camera revealed only "what [Easter] did in a public space." *Id.* at 568. "[A]ny member of the public" present in the storage facility could have observed the same thing. *United States v. Houston*, 813 F.3d 282, 290 (6th Cir. 2016). That police had previously conducted a "drive-by" and observed one of Easter's cars parked in front of Unit H17 confirms the point. R.48-4 at 4. Because other customers can and often do "travers[e] the

5

public parts of [a storage] facility," a patron does not have a reasonable expectation of privacy outside of his storage unit. *Cf. United States v. Karo*, 468 U.S. 705, 721 (1984) (no violation of reasonable expectation of privacy when officers in storage facility's common area detected the scent of contraband emanating from defendants' locker). Easter thus may not challenge the surveillance-camera warrant.

Easter resists this conclusion on the ground that the camera repeatedly recorded the area around Unit H17 for several days. But we have held that even weeks of continuous video surveillance of a defendant's carport did not violate a reasonable expectation of privacy. *May-Shaw*, 955 F.3d at 567–69; *see also Houston*, 813 F.3d at 288–90 (no violation of reasonable expectation of privacy resulted from ten weeks of continuous video surveillance of defendant's front porch). And the reality that the camera sometimes captured the interior of the storage unit does not change the analysis. Easter often left his storage unit's door open while he worked. The camera thus captured only "what [Easter] made public to any person" walking by Unit H17. *Houston*, 813 F.3d at 288.

Easter insists that the government failed to raise this argument below. Not so. The government pressed this argument in the trial court, R.51 at 12–13, and renewed it on appeal.

*Searches of Unit H17 and his girlfriend's home.* Easter next claims that the police lacked probable cause to search Unit H17 and his girlfriend's home. This argument falls short as well.

In view of all of the evidence the police had gathered in their investigation of Easter before obtaining this search warrant for the home in which he lived—serial controlled buys, GPS tracking, surveillance of the storage unit—the police readily "cleared the modest probable cause bar." *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (en banc). "[W]hen a drug dealer's activity is regular and ongoing, it is more likely that his home will have evidence of that activity—

supply, records, or monetary profits." *United States v. Simmons*, 129 F.4th 382, 387 (6th Cir. 2025). That the dealer "ha[s] a stash house does not ameliorate the idea that other information or evidence of the crime would still be contained at his . . . residence." *Id.* at 389 (quotation omitted).

The affidavits established that Easter was a regular drug trafficker and that he often traveled from his girlfriend's home, where he appeared to live, to the storage unit before heading directly to drug deals. One of those drug deals occurred less than 48 hours before police sought the warrants, meaning that the affidavit "detail[ed] recent, reliable evidence of drug activity." *Simmons*, 129 F.4th at 387 (quotation omitted). And officers had video footage of a masked Easter at Unit H17 packaging a baggie of white powder. All of this sufficed to establish probable cause.

Easter maintains that the earlier vehicle-tracking and camera-surveillance warrants lacked probable cause, thus tainting the later affidavits. But, as just shown, the previous warrants did not violate the Fourth Amendment. "[W]hen the government acts lawfully," as the district court aptly put it, "there is no poisonous tree." R.58 at 9.

Easter invokes the support of several of our cases, but none helps him. Each case involves an affidavit drawing threadbare or unreliable connections between the location to be searched and the crime to be solved. *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006); *United States v. Carpenter*, 360 F.3d 591, 593–95 (6th Cir. 2004) (en banc); *United States v. Helton*, 314 F.3d 812, 820–23 (6th Cir. 2003). The nexus in this case, by contrast, left nothing to the imagination.

### III.

Easter separately contends that the district court erred in denying him a *Franks* hearing to address omissions from the affidavits. *See Franks v. Delaware*, 438 U.S. 154 (1978). A defendant may receive such a hearing "if and only if" he "makes a substantial preliminary showing" that the

7

police "engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit" and that "a finding of probable cause would not be supported by the affidavit if the omitted material were considered." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).

Easter cannot meet this standard. He provides no evidence that even suggests, much less shows, that the police had an "intention to mislead." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis omitted). That alone undercuts his challenge.

Making matters worse, none of the alleged omissions identified by Easter would have changed the probable-cause calculation. He points, for example, to the police's failure to mention that he sometimes drove other cars in addition to the Impala. But as the district court pointed out, "Easter's access to other vehicles [did] not diminish the Impala's involvement in Easter's suspected operation, nor [did] it raise any doubt as to the likelihood that surveilling the Impala would uncover additional evidence of Easter's suspected criminal activity." R.58 at 5–6.

Easter's complaint that the affidavits did not show why the confidential informant worked for law enforcement also misses the mark. An affidavit need only "contain a statement about *some* of the underlying circumstances indicating the informant was credible or that his information was reliable." *Helton*, 314 F.3d at 822 (emphasis added). In these affidavits, officers explained that they had successfully employed the confidential informant to conduct controlled buys on over thirteen occasions, and that the informant had provided detailed information leading to the arrests of several fugitives. That history of reliability, especially when paired with the other corroborating information in the affidavits, sufficed to establish probable cause. No material omissions occurred.

We affirm.